**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **FERCAN E. KALKAN, individually;** | § | |
| **and PINEY POINT 2023 LLC,** | § | |
| *Plaintiffs,* | § | |
| **v.** | § | **Civil Action No. 4:24-cv-02548** |
| | § | |
| **FANNIE MAE; GAVRIEL TOSO,** | § | |
| **as Substitute Trustee; and** | § | |
| *Defendants.* | § | |

**PLAINTIFF'S EMERGENCY MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND APPLICATION FOR**
**TEMPORARY INJUNCTION**

**TO THE HONORABLE UNITD STATES DISTRICT COURT:**

Plaintiff Piney Point 2023 LLC ("Piney Point") respectfully submits this Emergency Motion for Temporary Restraining Order and Application for Temporary Injunction pursuant to Federal Rule of Civil Procedure 65 and Local Rules 7.1 and 65 of the Southern District of Texas, and in support thereof would show the Court as follows:

**I.**

**INTRODUCTION AND SUMMARY OF RELIEF REQUESTED**

1.      This is an emergency motion seeking to halt an imminent foreclosure sale scheduled for January 6, 2026—two days from the date of this filing—of the Village at Piney Point Apartments (the "Property"), a 1,094-unit apartment complex housing approximately 4,400 residents in Houston, Texas. *See* EXHIBIT A – Notice of Substitute Trustee's Sale dated December 15, 2025.

2.      Plaintiff seeks emergency relief to prevent the irreparable destruction of multiple substantial interests that will occur if this foreclosure proceeds:

(a)      A pending $25+ million insurance claim for Hurricane Beryl damage that may be extinguished upon transfer of the insurable interest—this

claim cannot be "made whole" by money damages after foreclosure because the claim itself may cease to exist;[1]

(b) The potential displacement of approximately 4,400 residents, including the highest concentration of Afghan refugees in the Houston metropolitan area—vulnerable populations who fled Taliban rule following the U.S. withdrawal and who have extremely limited housing alternatives;[2]

(c) The loss of unique real property that was under contract for $86 million with committed institutional financing from Liberty Bankers Life Insurance Company; and

(d) The artificial inflation of a deficiency claim through a credit bid of approximately $60 million on a $95 million property, which was appraised by JLL in 2023 for $132 Million—a transaction that will never occur on the open market and serves only to maximize Plaintiff's purported debt while transferring the property to Fannie Mae's pre-selected stalking horse bidder.

3. The foreclosure is originally predicated on an alleged "Repair Default"—but Fannie Mae itself caused the conditions it now claims as default by: (i) refusing to release any of the $2,044,000 Repair Reserve that Plaintiff deposited at closing for property repairs; and (ii) ignoring the Force Majeure provisions in the Loan Agreement that explicitly excuse repair delays caused by "acts of God"—which undeniably includes two federally-declared disasters (FEMA-4781-DR and FEMA-4798-DR).

4. This Motion is supported by the Affidavit of Fercan E. Kalkan attached hereto as EXHIBIT 1 and the documentary exhibits attached hereto and incorporated by reference.

---

[1]Insurance claims constitute property interests that may be destroyed by foreclosure. The extinction of a substantial pending insurance claim is a cognizable irreparable injury distinct from the loss of the real property itself. See generally Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (injury must be "concrete and particularized").

[2]The public interest in protecting vulnerable populations, including refugees resettled under federal programs managed by DHS, is a significant factor in the preliminary injunction analysis. Courts have recognized housing stability as a matter of substantial public concern. See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., 576 U.S. 519, 539 (2015).

## II.

## LEGAL STANDARD

5.      Federal Rule of Civil Procedure 65(b) authorizes the Court to issue a temporary restraining order without written or oral notice to the adverse party if: (a) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (b) the movant's attorney certifies in writing any efforts made to give notice and the reasons why notice should not be required.[3]

6.      To obtain a preliminary injunction, the movant must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the threatened harm the injunction may cause the opposing party; and (4) that granting the injunction will not disserve the public interest. *Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008).*[4]

7.      The Fifth Circuit applies the *Winter* framework and has emphasized that preliminary injunctions are "extraordinary remed[ies]" to be granted only when the movant "clearly carries the burden of persuasion" on all four factors. *Lake Charles Diesel, Inc. v. General Motors Corp., 328 F.3d 192, 196 (5th Cir. 2003)*; *Texas v. United States, 809 F.3d 134, 150 (5th Cir. 2015)*. As demonstrated below, Plaintiff satisfies each element.

8.      Critically, both Texas and federal courts have consistently recognized that "real estate is generally considered unique" and that "money damages are not adequate to

---

[3]A TRO may be issued ex parte under Rule 65(b)(1) only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and the movant's attorney certifies the efforts made to give notice and reasons why notice should not be required. Fed. R. Civ. P. 65(b)(1)(A)-(B).

[4]The Supreme Court made clear in Winter that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." 555 U.S. at 20. The Fifth Circuit has consistently applied this four-factor test. See Texas v. United States, 809 F.3d 134, 150 (5th Cir. 2015).

compensate parties for its loss when it is wrongfully conveyed to another." *Butnaru v. Ford Motor Co., 84 S.W.3d 198, 211 (Tex. 2002)*; *see also Cheniere Energy, Inc. v. Parallax Enters., LLC, 585 S.W.3d 70, 76-77 (Tex. App.—Houston [14th Dist.] 2019, pet. dism'd)*. This principle is particularly strong here given the commercial nature of the Property, its irreplaceable community of residents, and the pending insurance claim.[5]

### III.

### <u>STATEMENT OF FACTS</u>

**A.     The Property and Its Critical Role as Workforce Housing**

9.     The Village at Piney Point Apartments (the "Property") is a 1,094-unit workforce housing community located at 2601 Lazy Hollow Drive, Houston, Texas 77063, in the heart of the Energy Corridor. The Property is zoned as workforce housing and serves a critical community function—providing affordable housing to working families in one of Houston's most desirable employment areas.

10.     The Property houses approximately 4,400 residents, including what is believed to be the highest concentration of Afghan refugees in the Houston metropolitan area. These are individuals and families who were resettled in the United States following the August 2021 withdrawal from Afghanistan—many of whom served as interpreters, guides, and support personnel for U.S. military operations. They fled the Taliban with nothing and were placed in this community by refugee resettlement organizations. A foreclosure and subsequent mass eviction would displace this vulnerable population into a housing market that has virtually no comparable affordable alternatives.

---

[5]Texas courts have long recognized that real property is unique and that foreclosure causes irreparable harm. See Butnaru v. Ford Motor Co., 84 S.W.3d 198, 211 (Tex. 2002) ("An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard."). This principle is particularly strong in commercial property cases involving ongoing business operations.

**B.    The Loan Transaction and Fannie Mae's Systematic Breach**

11.    On June 8, 2023, Plaintiff closed on a $73,893,000 loan (the "Loan") from Defendant Fannie Mae (formally, Federal National Mortgage Association), originated through Defendant JLL Real Estate Capital, LLC, and secured by the Property. At closing, Plaintiff deposited a total of $4,207,324.67 into various escrow accounts, including:

> •    $2,044,000.00 into a Repair Reserve specifically designated for completion of property repairs;
>
> •    $453,072.00 into an Insurance Reserve for property insurance premiums; and
>
> •    Additional amounts for tax escrows, replacement reserves, and other required deposits.

*See* EXHIBIT B – HUD-1 Settlement Statement dated June 8, 2023.

12.    The purpose of the Repair Reserve was explicit: these funds were collected from Plaintiff and held in escrow specifically so that Plaintiff could draw upon them to complete property repairs required under the Loan Agreement. The Repair Reserve was not a gift to Fannie Mae—it was Plaintiff's money, deposited for a specific contractual purpose.

13.    Over the eighteen months from loan closing (June 8, 2023) through Fannie Mae's purported acceleration (December 2024), Fannie Mae released exactly $0.00 from the Repair Reserve to Plaintiff for repairs—while simultaneously claiming a "Repair Default" as a basis for acceleration.

14.    This is the ***central paradox*** of Fannie Mae's position: It collected $2,044,000 specifically for repairs, refused to release any of those funds despite repeated requests, then declared a "Repair Default" for the very repairs it prevented Plaintiff from completing with its own escrowed funds. Under fundamental contract law principles, this constitutes a prior material breach that excuses any alleged default by Plaintiff. *Mustang Pipeline Co. v. Driver*

*Pipeline Co., 134 S.W.3d 195, 196 (Tex. 2004)* ("When a party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.").[6]

**C.     Two Federally-Declared Disasters Constitute Force Majeure Under the Loan Agreement**

15.     On **May 16, 2024**, the Houston Derecho struck the Property and surrounding area with catastrophic force. The President of the United States declared a major disaster for Harris County, Texas under FEMA-4781-DR for severe storms, straight-line winds, tornadoes, and flooding. *See* EXHIBIT C – FEMA Disaster Declaration FEMA-4781-DR.

16.     Just 53 days later, on July 8, 2024—ironically, one day after this case was removed to federal court—Hurricane Beryl struck the Property with wind speeds of 106 MPH and sustained winds over 73 MPH. The President declared a second major disaster for Harris County under FEMA-4798-DR. The Property lost electrical power for 37 consecutive days following Hurricane Beryl—during the hottest part of a Houston summer. *See* EXHIBIT C – FEMA Disaster Declaration FEMA-4798-DR.

17.     The Loan Agreement explicitly addresses Force Majeure. Section 1 defines "Force Majeure" to include "*acts of God*, acts of war, civil disturbance, governmental action . . . strikes, lockouts, fire, *unavoidable casualties or any other causes beyond the reasonable control of Borrower*." (emphasis added). Two federally-declared disasters are, by definition, "acts of God" and "unavoidable casualties" beyond Plaintiff's control.[7]

18.     More importantly, the Loan Agreement explicitly provides that repair obligations are "subject to Force Majeure, if applicable" in multiple provisions:

---

[6] A prior material breach by one party excuses the other party's subsequent non-performance. See Mustang Pipeline Co. v. Driver Pipeline Co., 134 S.W.3d 195, 196 (Tex. 2004) ("When a party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance."); Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc., 518 S.W.3d 432, 436 (Tex. 2017).

[7] Under Texas law, Force Majeure provisions are generally enforceable as written. The doctrine excuses performance when an event beyond the party's control prevents performance. See Virginia Power Energy Mktg., Inc. v. Apache Corp., 297 S.W.3d 397, 402 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). Federal disaster declarations are conclusive evidence of Force Majeure events.

- Section 6(zz)(3)(A) – Required Repairs: "subject to Force Majeure, if applicable";

- Section 6(zz)(3)(B) – Additional Lender Repairs: "subject to Force Majeure, if applicable";

- Section 6(zz)(3)(C) – Additional Lender Replacements: "subject to Force Majeure, if applicable"; and

- Section 6(zz)(4)(D) – Extension provisions for Force Majeure delays.

*See* EXHIBIT D – Loan Agreement Force Majeure Provisions (highlighted excerpts).

19.     Rather than applying these contractual provisions as written—and rather than releasing Repair Reserve funds to assist with disaster recovery—Fannie Mae took the opposite approach. On May 17, 2024—one day after the Houston Derecho—Fannie Mae *seized* the entire $2,044,000 Repair Reserve and $453,072 Insurance Escrow. This seizure prevented Plaintiff from accessing its own funds to make disaster repairs, compounding the harm caused by the storms and making it impossible to complete the repairs that Fannie Mae now claims as the basis for default.

**D.     Plaintiff's Continued Monetary Performance Despite Force Majeure**

20.     Despite Fannie Mae's wrongful acceleration and despite being battered by two federally-declared disasters, Plaintiff has paid a total of **$5,472,869.04** on the Loan. The wire transfer records—each explicitly referencing "MORTGAGE PAYMENT" and "LOAN NUMBER 68190"—demonstrate continuous monetary performance through October 2025. *See* EXHIBIT E – Wire Transfer Records with Bank Confirmation Numbers.

21.     This raises a fundamental question: *How can Fannie Mae claim the Loan is in "default" when it has received nearly $5.5 million in payments?* Under Texas law, continued

acceptance of payments after acceleration may constitute waiver of the acceleration. *Holy Cross Church of God in Christ v. Wolf, 44 S.W.3d 562, 567 (Tex. 2001).*[8]

**E.    The Pending $25+ Million Insurance Claim at Imminent Risk**

22.    On August 8, 2025, Dr. Kalkan engaged Z.E. Wotila of Restoration Claims, LLC as public adjuster for the Property. An insurance claim was filed with the carrier (Claim No. E&M File #1000551788) for damage sustained from Hurricane Beryl. Plaintiff has submitted documentation of over $13 million in direct expenses already incurred, with initial repair estimates expected to exceed $25 million.

23.    As Mr. Wotila stated in his letter to counsel:

> "*It is essential that you keep an insured interest in this property for all parties to be properly indemnified and full recovery to take place.*"

*See* EXHIBIT F – Restoration Claims Letter from Z.E. Wotila dated August 8, 2025. Foreclosure will extinguish Plaintiff's insurable interest and will likely destroy this substantial claim recovery. This is not speculative harm—it is a certainty. Once foreclosed, Plaintiff will have no standing to pursue the insurance claim, and the claim itself may be abandoned or compromised by any successor owner. This harm cannot be remedied by money damages after foreclosure because the claim itself will cease to exist.

**F.    Procedurally Defective Foreclosure Notice**

24.    The Notice of Substitute Trustee's Sale is procedurally defective for multiple independent reasons:[9]

---

[8] Under Texas law, acceptance of payments after acceleration may constitute waiver of acceleration. See Holy Cross Church of God in Christ v. Wolf, 44 S.W.3d 562, 567 (Tex. 2001). Continued acceptance of payments is inconsistent with treating the debt as fully accelerated and immediately due.

[9] Texas Property Code § 51.002(b) requires at least twenty-one (21) days' notice before a foreclosure sale. Strict compliance with statutory foreclosure requirements is mandatory. See Ogden v. Gibraltar Sav. Ass'n, 640 S.W.2d 232, 233 (Tex. 1982) ("Foreclosure notice must be strictly construed in favor of the debtor."). Procedural defects in foreclosure notices can render a sale voidable.

(a) **Unsigned Substitute Trustee Appointment:** The Appointment of Substitute Trustee designating Gavriel Toso as substitute trustee is not properly executed. Texas Property Code § 51.0075 requires a valid appointment before a substitute trustee may conduct a foreclosure sale. *See* **EXHIBIT A – Appointment of Substitute Trustee (unsigned/improperly executed)**.

(b) **Potential 21-Day Notice Violation:** Under Texas Property Code § 51.002(b), written notice of sale must be given at least twenty-one (21) days before the foreclosure sale date. The Notice was signed on December 15, 2025, for a January 6, 2026 sale—21 calendar days. It appears that the notice may not have actually been mailed until December 16, 2025 and it was not delivered until after the 21 day time period. Any defect in the date of mailing or method of service could render the notice defective. *See Ogden v. Gibraltar Sav. Ass'n, 640 S.W.2d 232, 233 (Tex. 1982)* ("Foreclosure notice must be strictly construed in favor of the debtor."). The Deed of Trust requires notice to be on the date it is received. DOT paragraph 8.

## G. The Conflicted Receiver's Destruction of Property Value

25.     A receiver is a fiduciary who owes duties of loyalty, care, and impartiality to *all parties* with an interest in the receivership estate—not just the party that sought the receivership. *Netsphere, Inc. v. Baron, 703 F.3d 296, 305 (5th Cir. 2012)* (receivership is an "extraordinary remedy" requiring neutral fiduciary).[10]

26.     Evidence shows that Tarantino Properties, Inc. ("Tarantino") was embedded in the Stalking Horse bidder's (Havenrock's) due diligence process *before* Tarantino was appointed as "neutral" Receiver. On September 2, 2025—months before the November 22, 2025 Receivership Order—Jein Gadson of HRI Partners (Havenrock's affiliate) sent an email copying Esther Craven, Tarantino's Regional Vice President, regarding due diligence on the Property. *See* EXHIBIT G – September 2, 2025 Email from Jein Gadson to Esther Craven.

27.     Since its appointment on November 22, 2025, Tarantino has presided over catastrophic deterioration of the Property:

---

[10]Receivership is an extraordinary equitable remedy that should be employed cautiously and only when necessary. See Netsphere, Inc. v. Baron, 703 F.3d 296, 305 (5th Cir. 2012). A receiver owes fiduciary duties to all interested parties, not just the party that sought the receivership.

- 32 consecutive days of raw sewage overflow from manholes;

- Doubled crime rates despite doubling security staff;

- Health code violations at the highest level in the Property's history; and

- Inoperable heating systems through winter months.

28. The contrast is stark: Fannie Mae released $0 to Plaintiff for repairs over 18 months, yet advanced $950,000 to the Receiver within 30 days of appointment.

**IV.**

**FANNIE MAE'S HISTORIC PATTERN OF FRAUD AND ITS
MANUFACTURED DEFAULT STRATEGY**

**A.      Fannie Mae's Documented History of Institutional Fraud**

29. This is not the first time Fannie Mae has been accused of institutional fraud. In 2006, the Office of Federal Housing Enterprise Oversight ("OFHEO") issued a devastating 340-page report finding that Fannie Mae senior executives had systematically "manipulated accounting to <u>collect millions of dollars</u> in undeserved bonuses and to deceive investors." The Securities and Exchange Commission imposed a $400 million civil penalty—one of the largest accounting fraud penalties in history at that time. The OFHEO report described "an arrogant and unethical corporate culture" where "smooth growth in profits and precisely-hit earnings targets" were "illusions deliberately created by senior management using faulty accounting."[11]

30. Nearly two decades later, that pattern continues. In its <u>November 2024 SEC 10-Q filing,</u> Fannie Mae disclosed that it had "discovered instances of multifamily lending transactions in which one or more of the parties involved engaged in mortgage fraud or possible mortgage fraud." Fannie Mae identified financial losses from mortgage fraud as its top risk

---

[11]In 2006, the Office of Federal Housing Enterprise Oversight (OFHEO) issued a blistering 340-page report finding that Fannie Mae senior executives 'manipulated accounting to collect millions of dollars in undeserved bonuses and to deceive investors.' The SEC imposed a $400 million civil penalty—one of the largest accounting fraud penalties in history. See Report of the Special Examination of Fannie Mae, OFHEO (May 2006).

factor. The agency acknowledged "certain gaps" in its processes for managing multifamily loan origination fraud risk and oversight of seller/servicer counterparties.

31.     The scope of Fannie Mae's current fraud exposure is staggering. The Department of Justice has prosecuted multiple fraudulent schemes involving Fannie Mae loans, including:

- Boruch Drillman – Pleaded guilty in December 2023 to a $165 million mortgage fraud conspiracy (linked to Madison Title);

- Aron Puretz – Pleaded guilty in June 2024 to a $54.7 million mortgage fraud conspiracy;

- Chaim Puretz, Frederick Shulman, and Moshe Silber – Pleaded guilty in August 2024 to fraud involving a $74 million Fannie Mae loan (JLL suffered $18 million loss on this loan).

*See* EXHIBIT H – DOJ Press Release, $165M Mortgage Fraud Conspiracy (Dec. 14, 2023); EXHIBIT I – DOJ Press Release, $119M Mortgage Fraud Conspiracy.

32.     Significantly, Fannie Mae's response to these scandals has been to cut ties with title insurers Riverside Abstract and Madison Title—the same Madison Title involved in the fraud schemes. Yet Fannie Mae continues to work with JLL (Defendant JLL Real Estate Capital, LLC's parent company), despite JLL's $18 million loss from fraud in 2024 and the Department of Justice's ongoing investigation. This demonstrates that Fannie Mae's fraud risk management is, at best, selective—and at worst, complicit.[12]

## B.     The Manufactured Default: Dispossession, Not Performance

33.     The pattern of conduct in this case reveals that Fannie Mae's objective is not loan performance—it is *property seizure*. The evidence demonstrates a deliberate strategy to manufacture default conditions and dispossess Plaintiff of a valuable asset:

---

[12]Fannie Mae ceased doing business with title insurers Riverside Abstract and Madison Title, both linked to the fraud schemes, demonstrating Fannie Mae's awareness of systemic fraud in its multifamily lending operations. See Bisnow, 'Fannie Mae Admits Financial Losses Amid Ongoing Mortgage Fraud Investigation' (Nov. 4, 2024).

(a) **Withheld Repair Funds While Claiming Repair Default:** Fannie Mae collected $2,044,000 specifically for repairs, released $0 over 18 months, then claimed "Repair Default." This is not loan servicing—it is entrapment. A lender genuinely interested in loan performance would release escrowed repair funds to facilitate repairs, not hoard them while simultaneously demanding performance.

(b) **Refused All Settlement and Mediation Efforts:** Despite Plaintiff's repeated good-faith attempts to resolve this dispute, Fannie Mae has categorically did not engage in any meaningful settlement discussions or mediation. Plaintiff's proposed reinstatement. Plaintiff proposed payoff through refinancing.

(c) **Failed to Respond to Correspondence:** Throughout this dispute, Fannie Mae and its servicer have consistently failed to respond to written correspondence from Plaintiff seeking resolution. Letters requesting explanation of default calculations went unanswered. Requests for Repair Reserve disbursement records were ignored. Demands for Force Majeure consideration received no substantive response. This pattern of non-response is not inadvertent—it is strategic obstruction designed to force Plaintiff into foreclosure.

(d) **Rejected Higher Third-Party Offers:** Fannie Mae refused offers exceeding $75 million from third parties in favor of a pre-arranged credit bid of approximately $60 million to its stalking horse bidder. A lender seeking to maximize recovery would accept the higher offer. A lender seeking to dispossess the borrower and acquire the property below market value would do exactly what Fannie Mae has done.

(e) **Pre-Arranged Stalking Horse Bidder:** The evidence shows that the Receiver (Tarantino) was embedded in Havenrock's due diligence *months before* being appointed as "neutral" Receiver, and that the foreclosure is designed to transfer the Property to a pre-selected buyer at an artificially depressed price. This is not foreclosure—it is orchestrated property theft.

(f) **Ignored Force Majeure Provisions:** Despite two federally-declared disasters striking the Property and explicit Force Majeure language in the Loan Agreement, Fannie Mae refused to honor these contractual protections. This is not contract enforcement—it is contract repudiation when it suits Fannie Mae's dispossession objective.

34.     Texas courts have recognized that when a lender's objective is property acquisition rather than loan performance, such conduct constitutes actionable bad faith. In *State National Bank v. Farah Manufacturing Co., Inc., 678 S.W.2d 661, 683 (Tex. App.—El Paso 1984, writ dism'd by agr.)*, the court imposed $18 million in liability on financial institutions

for bad faith conduct in a foreclosure context, finding that the lenders' actions were designed to "destroy the business" rather than achieve loan performance.[13]

## C. Fannie Mae Comes to This Court with Unclean Hands

35.     The doctrine of unclean hands bars a party from obtaining equitable relief when that party has engaged in inequitable conduct. *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814-15 (1945)* ("He who comes into equity must come with clean hands."). Fannie Mae seeks equitable relief—foreclosure—while having:[14]

- Breached its obligation to release Repair Reserve funds;

- Ignored explicit Force Majeure protections in the contract it drafted;

- Refused all good-faith settlement and mediation efforts;

- Installed a conflicted Receiver already embedded with the stalking horse bidder; and

- Accepted $5,472,869.04 in payments while simultaneously claiming "default."

36.     This conduct, viewed in light of Fannie Mae's documented history of institutional fraud and the ongoing federal investigation into multifamily lending fraud involving its counterparties, demonstrates that Fannie Mae should be barred from equitable relief until it can demonstrate that its foreclosure is being pursued in good faith for loan performance purposes—not as a vehicle for property seizure below market value.

37.     A party cannot simultaneously claim to be a victim of fraud in SEC filings while perpetrating fraud on borrowers. Fannie Mae's conduct in this case—manufacturing a default by withholding repair funds, ignoring Force Majeure protections, refusing mediation, and

---

[13]Where a lender's objective is property acquisition rather than loan performance, courts have found bad faith. See State Nat'l Bank v. Farah Mfg. Co., Inc., 678 S.W.2d 661, 683 (Tex. App.—El Paso 1984, writ dism'd by agr.) (imposing $18 million liability on lender for bad faith conduct in foreclosure).

[14]Equity will not aid one whose conduct has been unconscionable. Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814-15 (1945) ('He who comes into equity must come with clean hands.'). A party seeking equitable relief such as foreclosure must not have engaged in inequitable conduct.

orchestrating a below-market sale to a pre-selected buyer—is precisely the type of "institutional fraud perpetrated by counterparties" that Fannie Mae claims to be investigating. *The irony is stark: Fannie Mae is doing to Plaintiff what it claims others have done to it.*

**V.**

**ARGUMENT: PLAINTIFF SATISFIES ALL FOUR WINTER FACTORS**

**A.      Plaintiff Has a Substantial Likelihood of Success on the Merits**

38.      The purpose of the likelihood-of-success requirement is not to conduct a "mini-trial" but to assess whether the movant has raised "serious questions" going to the merits. *Janvey v. Alguire, 647 F.3d 585, 596 (5th Cir. 2011).* Plaintiff need only demonstrate a likelihood of success on *at least one* claim. *Texas v. United States, 86 F. Supp. 3d 591, 672 (S.D. Tex. 2015), aff'd, 809 F.3d 134 (5th Cir. 2015).* Plaintiff demonstrates likelihood of success on multiple independent claims.

**1.      The Force Majeure Defense Is Dispositive**

39.      The Houston Derecho (FEMA-4781-DR) and Hurricane Beryl (FEMA-4798-DR) were **federally-**declared **major disasters**—textbook "acts of God" under the Loan Agreement's definition of Force Majeure. Section 6(zz)(3) of the Loan Agreement explicitly states that repair obligations are "subject to Force Majeure, if applicable." *See* EXHIBIT D – Loan Agreement §§ 1, 6(zz)(3)(A)-(C), 6(zz)(4)(D).

40.      Under Texas law, Force Majeure provisions are enforceable as written. *Virginia Power Energy Mktg., Inc. v. Apache Corp., 297 S.W.3d 397, 402 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).* Because two federally-declared disasters constitute Force Majeure under the Loan Agreement, repair timelines were automatically extended, and no valid "Repair Default" could occur for Force Majeure-excused delay. Fannie Mae's claimed "Repair Default" is therefore invalid as a matter of law.

**2.      Fannie Mae's Prior Material Breach Excuses Any Alleged Default**

41.      Fannie Mae collected $2,044,000 specifically for repairs, released $0 to Plaintiff over 18 months, then claimed "Repair Default." This is textbook prior material breach. Under fundamental contract principles, "[w]hen a party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co. v. Driver Pipeline Co., 134 S.W.3d 195, 196 (Tex. 2004)*; *see also Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc., 518 S.W.3d 432, 436 (Tex. 2017)*.

42.      Additionally, Fannie Mae's refusal to release Repair Reserve funds while demanding repairs violates the implied covenant of good faith and fair dealing. *Arnold v. Nat'l Cty. Mut. Fire Ins. Co., 725 S.W.2d 165, 167 (Tex. 1987)* (party violates good faith covenant when it exercises contractual discretion "to deprive the other party of the benefit of the bargain").

**3.      There Is No Monetary Default—Plaintiff Paid $5.5 Million**

43.      Plaintiff has paid **$5,472,869.04** on the Loan. Payments continued through October 2025—just **five weeks before** the Receiver was appointed. *See* EXHIBIT E – Wire Transfer Records. Fannie Mae cannot simultaneously accept nearly $5.5 million in payments while claiming the loan is in "default." Under Texas law, such acceptance may constitute waiver of acceleration. *Holy Cross Church of God in Christ v. Wolf, 44 S.W.3d 562, 567 (Tex. 2001)*.

**4.      The Wrongful Foreclosure Claim Is Strong**

44.      Fannie Mae intends to credit bid approximately $60 million for a $95+ million property that was under contract for $86 million—while refusing third-party offers exceeding $75 million. This demonstrates the sale is not being conducted in good faith to maximize value but rather to minimize Plaintiff's recovery and artificially inflate a deficiency claim. *Charter Nat'l Bank-Houston v. Stevens, 781 S.W.2d 368, 371 (Tex. App.—Houston [14th Dist.] 1989,*

*writ denied)* (wrongful foreclosure requires showing defect, grossly inadequate price, and causal connection).[15]

**B.    Plaintiff Will Suffer Irreparable Harm Absent Injunctive Relief**

45.    The Fifth Circuit requires that irreparable harm be "likely" rather than merely "possible." *Janvey v. Alguire, 647 F.3d 585, 600 (5th Cir. 2011)*. Here, harm is not merely "likely"—it is *certain* absent injunctive relief.[16]

46.    Texas courts have consistently recognized that "real estate is generally considered unique" and foreclosure causes irreparable harm. *Butnaru v. Ford Motor Co., 84 S.W.3d 198, 211 (Tex. 2002)*; *Cheniere Energy, Inc. v. Parallax Enters., LLC, 585 S.W.3d 70, 76-77 (Tex. App.—Houston [14th Dist.] 2019, pet. dism'd)*. Multiple distinct forms of irreparable harm will occur:

(a)    **Extinction of $25+ Million Insurance Claim:** Foreclosure will extinguish Plaintiff's insurable interest and destroy the pending insurance claim. This harm cannot be remedied by money damages because the claim itself will cease to exist upon transfer of ownership.

(b)    **Displacement of 4,400 Vulnerable Residents:** Approximately 4,400 residents, including Afghan refugees, face displacement into a housing market with virtually no comparable alternatives. *Cisneros v. Alpine Ridge Grp., 508 U.S. 10, 18 (1993)* (housing loss constitutes irreparable harm).[17]

(c)    **Loss of Unique Real Property:** Once foreclosed, the Property cannot be recovered from a bona fide purchaser. The Property's unique

---

[15] A wrongful foreclosure occurs when there is (1) a defect in the foreclosure sale proceedings, (2) a grossly inadequate selling price, and (3) a causal connection between the defect and the inadequate price. See Charter Nat'l Bank-Houston v. Stevens, 781 S.W.2d 368, 371 (Tex. App.—Houston [14th Dist.] 1989, writ denied). A credit bid substantially below market value can constitute evidence of inadequacy.

[16] The Fifth Circuit requires that irreparable harm be "likely" rather than merely "possible." See Janvey v. Alguire, 647 F.3d 585, 600 (5th Cir. 2011). However, this standard is satisfied when a foreclosure sale is scheduled and will proceed absent injunctive relief.

[17] Federal courts routinely recognize that displacement and housing loss constitute irreparable harm that cannot be adequately compensated by money damages. See Cisneros v. Alpine Ridge Grp., 508 U.S. 10, 18 (1993). The displacement of vulnerable populations, including refugees, weighs heavily in the irreparable harm analysis.

characteristics—location in the Energy Corridor, existing tenant community, and regulatory approvals—cannot be replicated.

**(d)** **Artificial Inflation of Deficiency Claim:** A credit bid of $60 million on a $95+ million property creates an artificially inflated deficiency claim that will follow Dr. Kalkan and cannot be fully remedied after the fact.

## C. The Balance of Hardships Strongly Favors Plaintiff

47. Plaintiff stands to lose:

- A $25+ million insurance claim;

- Equity in property valued at $95+ million (under contract for $86 million);

- Dr. Kalkan's 30-year business reputation; and

- The community Plaintiff built serving thousands of vulnerable residents.

48. Defendants, by contrast, will suffer only minor delay. Fannie Mae has already received nearly $5.5 million in payments. The Property is secured by a first-lien deed of trust. The Loan continues to be serviced. A brief delay to permit full adjudication of Plaintiff's claims causes no material harm to a government-sponsored enterprise with virtually unlimited resources. *Franklin Sav. Ass'n v. Reese, 756 S.W.2d 14, 15-16 (Tex. App.—Austin 1988, no writ)* (balance of hardships favors property owner facing foreclosure).

## D. The Public Interest Strongly Favors Injunctive Relief

49. The public interest strongly favors granting relief:

**(a)** **Protecting Vulnerable Populations:** Approximately 4,400 residents, including Afghan refugees resettled under federal programs, face displacement. The public interest in protecting vulnerable populations is substantial. *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., 576 U.S. 519, 539 (2015).*

**(b)** Preventing Homelessness in a city facing an affordable housing shortage;

**(c)** Preserving Workforce Housing in the Energy Corridor;

**(d)** Enforcing Contract Terms as written—the public interest is served when Force Majeure provisions in commercial contracts are honored.

# VI.

## CERTIFICATION REGARDING NOTICE

50. Pursuant to Federal Rule of Civil Procedure 65(b)(1)(B), undersigned counsel certifies as follows:

    (a) The foreclosure is scheduled for January 6, 2026, requiring immediate relief;

    (b) Advance notice would likely prompt Defendants to accelerate the foreclosure timeline or take other actions to moot Plaintiff's claims; and

    (c) Plaintiff will serve Defendants with this notice immediately upon filing and request an expedited hearing at the earliest possible time should the Court decline to issue a TRO ex parte.

# VII.

## BOND

51. Plaintiff is prepared to post a bond in an amount to be set by the Court pursuant to Federal Rule of Civil Procedure 65(c) and Local Rule 65. Plaintiff respectfully request that any bond be set at a reasonable amount in light of:

    • Defendants' continued receipt of nearly $5.5 million in payments;

    • Defendants' security interest in a property valued at $95 million;

    • The strength of Plaintiff's claims; and

    • The minimal harm to Defendants from a brief delay in foreclosure.

# VIII.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff Piney Point 2023 LLC respectfully prays that this Court:

    (a) Issue a Temporary Restraining Order enjoining Defendants Fannie Mae, Gavriel Toso (as Substitute Trustee), JLL Real Estate Capital, LLC, their officers, agents, servants, employees, attorneys, and all other persons acting in concert with them, from conducting the foreclosure sale scheduled for January 6, 2026, or any other foreclosure sale of the Property;

(b)     Set this matter for hearing on Plaintiff's Application for Preliminary Injunction at the earliest available date pursuant to Federal Rule of Civil Procedure 65(b)(2);

(c)     After hearing, issue a Preliminary Injunction maintaining the status quo pending trial on the merits;

(d)     Set the amount of bond required, if any, at a reasonable level consistent with Defendants' existing security interest;

(e)     Grant such other and further relief, both general and special, at law and in equity, to which Plaintiff may be justly entitled.

Dated: January 4, 2026.

Respectfully submitted,

*/s/ Joyce W. Lindauer*
Joyce W. Lindauer
State Bar No. 21555700
Joyce W. Lindauer Attorney, PLLC
1412 Main Street, Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Email: joyce@joycelindauer.com
**ATTORNEY FOR PLAINTIFF**
**PINEY POINT 2023, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 4, 2026, a true and correct copy of the foregoing Plaintiff's Emergency Motion for Temporary Restraining Order and Application for Preliminary Injunction was served on all counsel of record via the Court's CM/ECF electronic filing system.

I further certify that on January 4, 2026, at 6:30 p.m. a true and correct copy of the foregoing Plaintiff's Emergency Motion for Temporary Restraining Order and Application for Preliminary Injunction was served via email upon counsel for Defendant Fannie Mae listed below.

Spencer Hamilton
Email: spencer.hamilton@dentons.com

Glenn Ballard
Email: glenn.ballard@dentons.com

*/s/ Joyce W. Lindauer*
Joyce W. Lindauer

| EXHIBITS | DETAIL |
|---|---|
| 1 | Affidavit of Fercan E. Kalkan |
| A | Notice of Substitute Trustee's Sale (Dec. 15, 2025); Appointment of Substitute Trustee |
| B | Settlement Statement dated June 8, 2023 |
| C | FEMA Disaster Declarations (FEMA-4781-DR & FEMA-4798-DR); |
| D | Loan Agreement Force Majeure Provisions (§§ 1, 6(zz)(3)(A)-(C), 6(zz)(4)(D)) (highlighted excerpts) |
| E | Wire Transfer Records with Bank Confirmations ($5,472,869.04 total payments); |
| F | Restoration Claims Letter from Z.E. Wotila (Dec 15, 2025); |
| G | September 2, 2025 Email from Jein Gadson to Esther Craven. |
| H | DOJ Press Release (Dec. 14, 2023) – $165M Mortgage Fraud Conspiracy (JLL involvement) |
| I | DOJ Press Release – $119M Mortgage Fraud Conspiracy |
| J | Fannie Mae Notice Provisions |

# EXHIBIT "1"

| | | |
|---|---|---|
| FERCAN E. KALKAN, individually; | § | |
| and PINEY POINT 2023 LLC, | § | |
|     *Plaintiffs,* | § | |
| | § | |
| **v.** | § | Civil Action No. 4:24-cv-02548 |
| | § | |
| FANNIE MAE and | § | |
| Gavriel Toso, as Substitute Trustee, | § | |
| JLL Real Estate Capital, LLC | § | |
| | § | |
|     *Defendants.* | § | |

### AFFIDAVIT OF FERCAN E. KALKAN,
### IN SUPPORT OF APPLICATION FOR TEMPORARY
### RESTRAINING ORDER

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned notary public, personally appeared FERCAN E. KALKAN, who, being duly sworn, stated under oath as follows:

### I. INTRODUCTION

1.    My name is Fercan E. Kalkan. I am over 21 years of age, of sound mind, and fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are true and correct.

2.    I am a Plaintiff in this action, both individually and as the principal and manager of Plaintiff Piney Point 2023 LLC ("Piney Point"). I am also a guarantor of the loan at issue in this case.

3.    I submit this affidavit in support of Plaintiffs' Application for Temporary Restraining Order to prevent the imminent foreclosure of the Village at Piney Point Apartments (the "Property").

### II. PERSONAL BACKGROUND

4.    I am a naturalized United States citizen and a real estate business man. I have over 30 years of experience acquiring, stabilizing, and operating distressed multifamily properties in the Houston metropolitan area.

5.  Prior to the events giving rise to this lawsuit, I had never experienced a foreclosure or bankruptcy in my 30-year career. I have successfully acquired, rehabilitated, and operated numerous apartment communities, providing quality affordable housing to thousands of Houston-area residents.

6.  I acquired the Property because I saw an opportunity to stabilize a workforce housing community and serve a vulnerable population, including a significant refugee community.

## III. THE PROPERTY AND ITS COMMUNITY

7.  The Village at Piney Point Apartments is a 1,094-unit workforce housing community located at 2601 Lazy Hollow Drive, Houston, Texas 77063. The Property houses approximately 4,400 residents.

8.  The Property is home to the highest concentration of Afghan refugees in the Houston metropolitan area. These residents, many of whom fled Afghanistan following the U.S. withdrawal in 2021, speak non-English languages and have limited housing alternatives. These displaced refugees are directly placed under various programs run directly by the DHS.

9.  Under my ownership and management, the Property provided humanitarian services including a limited free food distribution program and an interdenominational church facility for the diverse faith communities residing there.

10. The foreclosure will displace approximately 4,400 residents, including these vulnerable refugee families who have already been displaced once from their homeland. This is not merely a financial dispute—it is a humanitarian crisis in the making.

## IV. THE LOAN TRANSACTION

11. On June 8, 2023, Piney Point closed on a loan (the "Loan") in the principal amount of $73,893,000 from Fannie Mae, serviced by JLL Real Estate Capital, LLC, to refinance existing debt on the Property.

12. Unlike typical refinance transactions where borrowers "cash out," I paid $4,207,324.67 in cash INTO the closing. This was not a cash-out refinance—I invested additional capital.

13. My cash contribution was used to establish the following escrow accounts:

| | |
|---|---|
| Tax Escrow: | $1,122,524.67 |
| Insurance Escrow: | $340,000.00 |
| Replacement Reserve Escrow: | $690,000.00 |
| Repair Escrow: | $2,044,000.00 |
| Title Escrow: | $11,000.00 |
| **TOTAL:** | **$4,207,524.67** |

14. The Repair Escrow of $2,044,000 is central to this dispute. These funds were collected by Fannie Mae specifically for property repairs. Over the 18 months from loan closing to foreclosure acceleration, Fannie Mae released exactly $0 of these funds to me for repairs—while simultaneously claiming I was in "Repair Default" for failing to complete repairs.

## V. THE REPAIR RESERVE BREACH

15. I submitted multiple reimbursement requests to Fannie Mae and JLL for release of funds from the $2,044,000 Repair Reserve. Every single request was denied.

16. The denials were often based on technicalities or unreasonable demands. For example, Fannie Mae demanded I obtain a principal paydown of $10 million before releasing repair funds—an impossible condition given that I had already paid close to $5 million at closing.

17. How can Fannie Mae claim I defaulted on repairs when Fannie Mae held $2,044,000 of my money designated for repairs and refused to release a single dollar? This is the central breach: Fannie Mae collected repair funds, refused to release them, then claimed default for the repairs it prevented.

18. Attached hereto as *Exhibit C* are copies of my reimbursement requests. Attached hereto as *Exhibit D* are copies of the denials.

## VI. FORCE MAJEURE EVENTS

19. On May 16, 2024, the Houston Derecho struck the Property. This storm was declared a federal disaster by FEMA (FEMA-4781-DR). The Property sustained significant damage.

20. One day later, on May 17, 2024, Fannie Mae seized ALL remaining escrow funds—rather than allowing me to use those funds for disaster repairs.

21. On July 8, 2024, Hurricane Beryl struck the Property. This was another federally-declared disaster (FEMA-4798-DR). Wind speeds reached 106 MPH with sustained winds over 73 MPH.

22. The Property was left without power for 37 consecutive days (July 8 through August 14, 2024). During this period, the Property was effectively uninhabitable.

23. The Loan Agreement defines "Force Majeure" to include "acts of God" and "unavoidable casualties." Two federally-declared disasters are textbook "acts of God." Section 6(zz)(3) of the Loan Agreement states that repair obligations are "subject to Force Majeure, if applicable."

24. Despite these Force Majeure events, Fannie Mae refused to extend repair timelines and instead accelerated the Loan based on "Repair Default"—for repairs that were delayed by federally-declared disasters.

25. Attached hereto as Exhibits FEMA-A and FEMA-B are the FEMA disaster declarations.

## VII. PLAINTIFFS' CONTINUED PAYMENTS

26. Despite the Force Majeure events, Fannie Mae's wrongful acceleration, and the seizure of my escrow funds, I continued to make substantial payments on the Loan:

| | | |
|---|---|---|
| May 3, 2024: | $574,513.58 | (Before storms) |
| Sep 26, 2024: | $1,000,000.00 | (After Hurricane Beryl) |
| Oct-Nov 2024: | $100,000.00 | (Post-storm payments) |
| Feb-Oct 2025: | $3,797,855.46 | (Bankruptcy adequate protection) |
| **GRAND TOTAL:** | **$5,472,869.04** | |

27. I paid nearly $5.5 million on a loan that Fannie Mae claims is in default. Each wire transfer explicitly referenced "MORTGAGE PAYMENT" and "LOAN NUMBER 68190."

28. Attached hereto as *Exhibit PAY-1* are copies of the wire transfer records documenting these payments.


## VIII. THE INSURANCE CLAIM

29. On August 8, 2025, I engaged Z.E. Wotila of Restoration Claims, LLC as public adjuster for the Property. Mr. Wotila is a licensed Texas Public Adjuster (TX #2165758).

30. We filed a claim with the insurance carrier (Claim No. E&M File #1000551788) for damage sustained from Hurricane Beryl.

31. Plaintiffs have submitted over $13 million in direct expenses incurred, including business interruption losses. Initial repair estimates by Restoration Claims are expected to exceed $25 million.

32. If foreclosure occurs, the insurance claim will be extinguished. Fannie Mae will acquire the Property and the insurance proceeds, while I will lose the benefit of the claim entirely.

33. This $25+ million insurance claim cannot be recovered after foreclosure. This is textbook irreparable harm.

34. Attached hereto as *Exhibit E* is the Restoration Claims letter dated December 15, 2025.


## IX. THE $86 MILLION SALE THAT WAS DESTROYED

35. In early 2025, before Fannie Mae's wrongful acceleration, I had negotiated a Purchase and Sale Agreement with American Realty Services for the Property at a contract price of $86,000,000.

36. In connection with this sale, Liberty Bankers Life Insurance Company issued a commitment letter for acquisition financing.

37. Before the American Realty PSA could be executed, Fannie Mae issued its Technical Default Notice and Notice of Foreclosure, destroying this viable $86 million exit.

38. Fannie Mae's actions prevented a sale that would have paid the Loan in full with surplus to spare.

39. Attached hereto as *Exhibits 6 and 7* are the Liberty Bankers Commitment Letter and the American Realty PSA.

## X. FORECLOSURE NOTICE DEFECTS

40. Upon information and belief, the foreclosure notice fails to comply with Texas Property Code § 51.002 in the following respects:

    (a) **Violation of 21-Day Notice Requirement:** The Notice of Substitute Trustee's Sale was allegedly executed on December 15, 2025 for a foreclosure sale scheduled in January 2026. Under Texas Property Code § 51.002(b), a notice of sale must be given at least twenty-one (21) days before the date of the sale. Upon information and belief, the notice was not properly filed and served in compliance with this statutory requirement];

    (b) **Unsigned Substitute Trustee Appointment:** The Appointment of Substitute Trustee document accompanying the Notice of Substitute Trustee's Sale is not properly signed. Under Texas Property Code § 51.0075, a substitute trustee must be properly appointed by a valid, executed instrument. An unsigned appointment document fails to validly designate the substitute trustee];

    (c) **Effect of Defects:** These procedural defects render the foreclosure notice invalid as a matter of law. A foreclosure sale conducted pursuant to a defective notice is voidable and subject to being set aside.

    (d) Attached hereto as *Exhibit F* is a copy of the Notice of Substitute Trustee's Sale and the unsigned Appointment of Substitute Trustee document.

## XI. LOAN BALANCE DISPUTES

41. The loan balance claimed by Fannie Mae is inaccurate and subject to bona fide dispute for the following reasons:

    (a) Rents Not Credited: Since the Receiver's appointment on November 21, 2025, rents have been collected from the Property but, upon information and belief, have not been credited to the loan balance. The Property has approximately [___] occupied units at an average rent of approximately $[___] per month. Rents collected since November 21, 2025 total approximately $[___], none of which has been credited to the loan balance.

    (b) Advances Without Notice: Fannie Mae advanced at least $950,000 to the Receiver within 30 days of appointment. I received no notice of these advances.

    (c) Escrow Seizure: Fannie Mae seized over $4.1 million in escrow funds on May 17, 2024—one day after the Houston Derecho.

42. I am entitled to an accounting of all rents collected, all advances made, and the proper application of my escrow funds before any foreclosure may proceed.

## XII. THE WRONGFUL FORECLOSURE

43. Upon information and belief, Fannie Mae intends to credit bid approximately $60,000,000 at the foreclosure sale—far below the outstanding loan balance of approximately $75,000,000.

44. At the same time, Fannie Mae has refused to accept any third-party offer for less than payment in full of the entire loan balance.

45. This is unconscionable: Fannie Mae will accept its own bid of $60 million while refusing offers from legitimate buyers exceeding $75 million.

46. The Property was under contract for $86 million. the appraisal that had been ordered by JLL on May 2023 the property was assessed for $132 Million. Yet Fannie Mae plans to acquire it for $60 million—a $35 million windfall that will be extracted from me and my investors.

47. This is not debt recovery. This is theft by foreclosure.

## XIII. THE RECEIVER'S MISCONDUCT

48. On November 21, 2025, this Court appointed Tarantino Properties, Inc. as Receiver for the Property.

49. Since Tarantino's appointment, the Property has deteriorated dramatically:

    (a) 32 consecutive days of raw sewage overflow in common areas;

    (b) Crime rates have DOUBLED, despite Tarantino doubling security;

    (c) The Property has received the highest health code violations in its history;

    (d) Heating systems are inoperable in numerous units;

    (e) Armed guards now patrol the leasing office, creating an atmosphere of fear.

50. Under my management, I reduced crime by 50% in my first year. I knew the tenant population, spoke some of their languages, and was accessible. My approach was "smile, handshake, hug."

51. The Receiver couldn't identify what languages the residents speak and mistook the church for a "gym."

52. Upon information and belief, Tarantino's Regional Vice President, Esther Craven, was coordinating with the Stalking Horse buyer (Havenrock) BEFORE Tarantino was appointed as Receiver. This is a fundamental conflict of interest.

53. Attached hereto as *Exhibit 5* is the September 2, 2025 email showing Tarantino personnel coordinating with Havenrock on due diligence.

## XIV. IRREPARABLE HARM

54. If the foreclosure proceeds, I will suffer irreparable harm that cannot be remedied by money damages:

(a) Loss of $25+ Million Insurance Claim: The pending insurance claim will be extinguished upon foreclosure. This claim cannot be recovered after the fact.

(b) Displacement of 4,400 Residents: Approximately 4,400 people, including vulnerable Afghan refugees, will be displaced. The harm to this community cannot be compensated.

(c) Loss of Unique Property: Real estate is unique by definition. The Property cannot be replaced.

(d) Wrongful Foreclosure at Inadequate Price: Fannie Mae will acquire the Property for $60 million when it is worth $95 million plus.

(e) Destruction of Business Reputation: A foreclosure will destroy my 30-year track record.

55. These harms are immediate, concrete, and irreparable. No amount of money damages can undo a foreclosure, restore displaced families to their homes, or recover an extinguished insurance claim.

## XV. LIKELIHOOD OF SUCCESS

56. I am likely to succeed on the merits because:

(a) Force Majeure: Two federally-declared disasters excused any repair delays. No valid "Repair Default" could occur.

(b) Fannie Mae Breached First: Fannie Mae collected $2,044,000 for repairs and released $0. A party cannot enforce a contract it has breached.

(c) No Monetary Default: I paid $5,472,869.04 on the Loan. There is no monetary default.

(d) Wrongful Foreclosure: Fannie Mae's plan to credit bid $60 million while refusing $75+ million offers demonstrates bad faith.

## XVI. BALANCE OF HARDSHIPS

57. The balance of hardships overwhelmingly favors Plaintiffs:

(a) If the TRO is granted: Fannie Mae suffers only minor delay. The Loan continues to be serviced. The Property is preserved.

(b) If the TRO is denied: I lose a $95 million plus property, a $25+ million insurance claim, and my 30-year reputation. 4,400 residents are displaced. The harm is catastrophic and irreversible.

58. The only "harm" to Defendants from maintaining the status quo is that they cannot execute their scheme to acquire the Property at a fraction of its value.

## XVII. PUBLIC INTEREST

59. The public interest strongly favors the TRO:

(a) Approximately 4,400 residents, including Afghan refugees, will be protected from displacement;

(b) Essential workforce housing will be preserved;

(c) Contracts will be enforced as written (including Force Majeure provisions);

(d) The integrity of the judicial system will be protected from fraud on the court.

## XVIII. CONCLUSION

60. For all of the foregoing reasons, I respectfully request that this Court grant Plaintiffs' Application for Temporary Restraining Order and enjoin the foreclosure sale pending a full hearing on the merits.

## FURTHER AFFIANT SAYETH NOT.

_____

FERCAN E. KALKAN, M.D.

SWORN TO AND SUBSCRIBED before me on this 02 day of January, 2026.

_____

Notary Public, State of Texas

My Commission Expires: 11/11/2029

[NOTARY SEAL]

Aliye A Arca
My Commission Expires
11/11/2029
Notary ID 135539578

8

# EXHIBIT A

 **Spencer D. Hamilton**
Partner

spencer.hamilton@dentons.com
D  +1 214-259-0982

Dentons US LLP
100 Crescent Court
Suite 900
Dallas, TX  75201
United States

dentons.com

December 15, 2025

## Via FedEx, Registered Mail, First Class Mail, and Electronic Mail

**Piney Point 2023 LLC**
143 Manor Lake Estates
Spring, Texas 77379
kalkan1@gmail.com

**Steven Shurn**
Hughes Watters & Askanase LLP
TotalEnergies Tower 1201 Louisiana St,
Houston, Texas 77002
sdshurn@hwa.com

**Joyce W. Lindauer**
Joyce W. Lindauer Attorney PLLC
117 S. Dallas Street
Ennis, Texas 75119
joyce@joycelindauer.com

**Fercan Engin Kalkan**
143 Manor Lake Estates
Spring, Texas 77379
kalkan1@gmail.com

**James Q. Pope**
The Pope Law Firm
6161 Savoy, Suite 1125
Houston, Texas 77036
jamesp@thepopelawfirm.com

**Jules P. Slim**
P.O. Box 140307
Irving, Texas 75014-0307
jslim@slimlawfirm.com

**Franklin Sterling Hill and Robert Neil Loughran**
Platt Richmond PLLC
1201 N. Riverfront Blvd., Suite 150
Dallas, TX 75207
fhill@plattrichmond.com
rloughran@plattrichmond.com

Re:  **NOTICE OF SUBSTITUTE TRUSTEE'S SALE ON JANUARY 6, 2026.**
Multifamily Loan and Security Agreement, dated June 8, 2023 (the "**Loan Agreement**"), executed by Piney Point 2023 LLC (the "**Borrower**"), and JLL Real Estate Capital, LLC (the "**Original Lender**" or "**Servicer**"), arising from and related to that certain loan ("**Loan**"),[1] in the original maximum principal amount of $73,893,000.00, evidenced by that certain Multifamily Note ("**Note**"), dated June 8, 2023, executed by the Borrower, and originally payable to the order of the Original Lender, which Note and Loan are secured by, *inter alia*, the lien of that certain Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing ("**Deed of Trust**" and/or "**Security Instrument**"), dated as of June 6, 2023, but effective as of

---

[1] Unless otherwise defined herein, any capitalized terms and phrases used herein shall bear the meanings and definitions assigned in the Loan Agreement.



dentons.com

December 15, 2025
Page 2

**NOTICE OF SUBSTITUTE TRUSTEE'S
SALE ON JANUARY 6, 2026**

Fannie Mae Loan No. 1720010141

June 8, 2023, executed by the Borrower and covering that certain real and personal property located in Harris County, Texas, as such property is more particularly described in the Deed of Trust (herein, the "**Property**"). The Note and Loan are guaranteed by Fercan Engin Kalkan (the "**Guarantor**").[2] Each of the Loan Agreement, Note, and Deed of Trust described hereinabove, together with certain other documents executed, delivered, and/or completed in connection with the aforementioned transaction documents are collectively referred to herein as the "**Loan Documents.**" The Original Lender assigned, negotiated, and transferred the Loan and all Loan Documents to Fannie Mae, the current owner and holder in due course of the Loan, the Note, and all Loan Documents.

**Fannie Mae Loan No.** 1720010141

Dear Obligors,

As you know, this firm represents Fannie Mae in connection with the above-referenced matter. Fannie Mae is the owner and holder in due course of the Note and all Loan Documents executed in connection with the Loan. As you are already aware from the *Notice of Default and Acceleration; Demand for Payment* ("**Notice of Acceleration**") served on you on May 17, 2024, and the numerous court filings in the bankruptcy case of the Borrower and the two different federal district court cases related to this Indebtedness and these Obligors, the full balance of all financial obligations owed under the Loan Documents remains accelerated and immediately due and payable in full to Fannie Mae. Fannie Mae hereby re-issues formal demand for the unpaid balance of all indebtedness evidenced by the Loan Documents and secured by the Deed of Trust, including, without limitation, principal, accrued interest, accrued interest at the default rate, applicable fees, charges, costs, and expenses incurred, and the attorneys' fees and collection costs that Fannie Mae has incurred (collectively, the "**Indebtedness**").

This letter, along with the enclosed Notice of Substitute Trustee's Sale (the "**Notice**"), constitutes formal notice to you that the Property is scheduled to be sold by public foreclosure sale. The Notice has been posted and filed with the County Clerk of Harris County, Texas. The sale, as authorized by the Deed of Trust, will take place on Tuesday, January 6, 2026, in accordance with the Deed of Trust and the Texas Property Code in the area designated by the Commissioners Court of Harris County, Texas, pursuant to § 51.002 of the Texas Property Code as the place where foreclosure sales are to take place (if no such place is so designated, the sale will take place in the area where the Notice is posted) or at such other location as may be designated by the Commissioners Court of Harris County, Texas at the date and time of the sale indicated herein and in the Notice. The earliest time this public foreclosure sale will occur is at 10:00 a.m. on

---

[2] Borrower and Guarantor are collectively referred to as the "**Obligors**".



December 15, 2025
Page 3

dentons.com

NOTICE OF SUBSTITUTE TRUSTEE'S
SALE ON JANUARY 6, 2026

Fannie Mae Loan No. 1720010141

January 6, 2026, and will be conducted no later than three hours thereafter. The Property will be sold to the highest bidder for cash (except that Fannie Mae reserves the right to credit-bid up to the unpaid full balance of the Indebtedness). All third-party bidders must *immediately* submit payment via cashier's check payable to the Substitute Trustee only, and before bidding such bidders must present proof of cashier's checks available that are payable to the Substitute Trustee.

The foreclosure will be by public sale, and you are invited to attend the sale and bid on the Property. The proceeds of the foreclosure sale will be applied in accordance with the terms of the Loan Documents and the Deed of Trust.

**Assert and protect your rights as a member of the armed forces of the United States. If you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, please send written notice of the active-duty military service to the sender of this notice immediately.**

If any person receiving this letter is in bankruptcy or has been discharged from the Indebtedness as a result of such person's bankruptcy proceedings, then this letter is not intended, and shall not be construed, as a demand for payment upon such person, and is sent for informational purposes only pursuant to applicable provisions of the Texas Property Code.

Please be advised that this notice is being given pursuant to the terms and provisions of the Loan Documents and the Texas Property Code. Fannie Mae does not waive any of its rights or remedies available under the Loan Documents or otherwise. No failure to exercise any rights or remedies available to Fannie Mae and no delay in exercising any such rights or remedies shall operate as a waiver of any rights which Fannie Mae may have pursuant to the terms of the Loan Documents or otherwise. Further, any reference by Fannie Mae to a specific Event of Default shall not constitute, nor be construed to be, a waiver of any other Event of Default that may now exist or hereafter arise under the Loan Documents.

Please be further advised that any discussions that may have occurred (or may occur in the future) between the Obligors and representatives of Fannie Mae regarding the Property or the Loan Documents evidence nothing more than the continuing good faith attempts of Fannie Mae to work out the existing problems in a manner reasonably acceptable to all parties. The Obligors may not rely upon any such discussions in any manner or fashion. Unless and until a binding, written agreement has been fully executed by and between all parties, Fannie Mae's rights and remedies are and will continue to be fully enforceable under the terms of the Loan Documents.

This letter is written without prejudice to Fannie Mae's other rights and remedies, all of which are expressly reserved. Please give this matter your immediate attention and contact me if you have any questions.



**NOTICE OF SUBSTITUTE TRUSTEE'S
SALE ON JANUARY 6, 2026**

**Fannie Mae Loan No. 1720010141**

Sincerely,

*/s/ Spencer D. Hamilton*

Spencer D. Hamilton
Partner

Enclosures

cc:     John Beck, of the Firm
         Glenn Ballard, of the Firm

## NOTICE OF SUBSTITUTE TRUSTEE'S SALE

THE STATE OF TEXAS  )
         )
COUNTY OF HARRIS   )

  WHEREAS, **Piney Point 2023 LLC** (the **"Borrower"**) executed and delivered a certain *Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing* (the **"Deed of Trust"**) dated as of June 6, 2023, but effective as of June 8, 2023, conveying to **Gavriel Toso**, as Trustee, the real and personal property described in that Deed of Trust, which is recorded in the Official Public Records of Harris County, Texas, as follows:

DATE RECORDED  DOCUMENT NO.

June 9, 2023    RP-2023-213210

  Whereas the undersigned has been appointed as a Substitute Trustee under this Deed of Trust; and

  WHEREAS, the indebtedness secured by this Deed of Trust has matured (by acceleration or otherwise) and remains outstanding and delinquent (after demand for payment in full therefore having been made and unperformed), and **FANNIE MAE,** the owner and holder of the indebtedness secured by this Deed of Trust and the due and lawful Beneficiary thereunder (by assignment and as successor in interest thereto), has requested the Substitute Trustees exercise the power to sell this Property (as defined below).

  NOW, THEREFORE, notice is hereby given that at **10:00 a.m.** (or within three hours thereafter) on **Tuesday, January 6, 2026,** I will sell:

- The real property described on the attached Exhibit "A" (the **"Real Property"**), and

- The other property (whether real property, personal property, fixtures or otherwise) which is (i) described in the Deed of Trust and (ii) located on, affixed to or otherwise appurtenant to that Real Property (collectively, the **"Property"**).

The Property described above shall be sold to the highest bidder. The sale shall be conducted in accordance with the Deed of Trust and the Texas Property Code in the area designated by the Commissioners Court of Harris County, pursuant to § 51.002 of the Texas Property Code as the place where foreclosure sales are to take place (if no such place is so designated, the sale will take place in the area where this Notice of Substitute Trustee's Sale is posted) at the date and time of the sale indicated herein above.

**FANNIE MAE**, the owner and holder of the indebtedness secured by the Deed of Trust, reserves the right to credit-bid at this sale. Except for any such credit-bid, the purchase price set forth in the final bid accepted by the Substitute Trustee is due and payable in cash (or cashier's checks) without delay upon acceptance of the bid.

In accordance with TEX. BUS. & COMM. CODE § 22.004, the winning bidder at the foreclosure sale, other than the owner and holder of the indebtedness, shall provide the following information to the Substitute Trustee at the time the Substitute Trustee completes the sale:

1. the name, address, telephone number, and e-mail address of the bidder and of each individual tendering or who will tender the sale price for the winning bid;

2. if the bidder is acting on behalf of another individual or organization, the name, address, telephone number, and e-mail address of the individual or organization and the name of a contact person for the organization;

3. the name and address of any person to be identified as the grantee in the Trustee's Deed;

4. the purchaser's tax identification number;

5. a government-issued photo identification to confirm the identity of each individual tendering funds for the winning bid; and

6. any other information reasonably needed to complete the Substitute Trustee's duties and functions concerning the sale.

Notice. Assert and protect your rights as a member of the armed forces of the United States. If you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, please send written notice of the active-duty military service to the sender of this notice immediately.

Executed this _____ day of _____.

By: _____
    Substitute Trustee

**Sandy Dasigenis, Jeff Leva, Steve Leva, and David Garvin**

Attn: Spencer D. Hamilton
Dentons US LLP
100 Crescent Court, Suite 900
Dallas, Texas 75201-2347
214-259-0982
spencer.hamilton@dentons.com

## EXHIBIT "A"

### LEGAL DESCRIPTION OF PROPERTY

Land situated in Harris County, Texas and described as follows:

**TRACT 1:**

3.071 ACRES OF LAND LOCATED IN THE JOHN TAYLOR LEAGUE, ABSTRACT NUMBER 72, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, AND BEING ALL OF "TRACT 1" OF WEST POINT, SECTION 1, AS RECORDED IN VOLUME 156, PAGE 42, HARRIS COUNTY MAP RECORDS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND "X" MARKING THE NORTHWEST CORNER OF SAID "TRACT 1" AND BEING IN THE EASTERLY RIGHT-OF-WAY LINE OF LAZY HOLLOW DRIVE (60-FOOT WIDTH) AS RECORDED IN VOLUME 153, PAGE 50, HARRIS COUNTY MAP RECORDS;

THENCE, NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 422.16 FEET TO A 5/8-INCH CAPPED IRON ROD STAMPED SOUTH TEXAS SURVEYING SET;

THENCE, SOUTH 00 DEGREES 04 MINUTES 00 SECONDS WEST, A DISTANCE OF 317.00 FEET TO A SET 5/8 INCH CAPPED IRON ROD STAMPED SOUTH TEXAS SURVEYING;

THENCE, SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 421.79 FEET TO A SET "X";

THENCE, NORTH 00 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 317.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 3.071 ACRES (133,776 SQUARE FEET) OF LAND.

**TRACT 2:**

3.068 ACRES OF LAND LOCATED IN THE JOHN TAYLOR LEAGUE, ABSTRACT NUMBER 72, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, AND BEING ALL OF "TRACT 2" OF WEST POINT, SECTION 1, AS RECORDED IN VOLUME 156, PAGE 42, HARRIS COUNTY MAP RECORDS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A FOUND "X" MARKING THE NORTHWEST CORNER OF SAID "TRACT 1" OF SAID WEST POINT, SECTION 1, AND FURTHER BEING IN THE EASTERLY RIGHT-OF-WAY LINE OF LAZY HOLLOW DRIVE (60-FOOT WIDTH), AS RECORDED IN VOLUME 153, PAGE 50, HARRIS COUNTY MAP RECORDS;

THENCE, SOUTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 317.00 FEET, ALONG THE EASTERLY RIGHT-OF-WAY LINE OF SAID LAZY HOLLOW DRIVE TO A SET "X" FOR THE POINT OF BEGINNING;

THENCE, EAST, A DISTANCE OF 421.79 FEET TO A SET 5/8 INCH CAPPED IRON ROD STAMPED SOUTH TEXAS SURVEYING;

THENCE, SOUTH 00 DEGREES 04 MINUTES 00 SECONDS WEST, A DISTANCE OF 317.00 FEET TO A SET 5/8 INCH CAPPED IRON ROD STAMPED SOUTH TEXAS SURVEYING;

THENCE, SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 421.42 FEET TO A FOUND NAIL;

THENCE, NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 317.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 3.068 ACRES (133,652 SQUARE FEET) OF LAND.

**TRACT 3:**

3.064 ACRES OF LAND LOCATED IN THE JOHN TAYLOR LEAGUE, ABSTRACT NUMBER 72, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, AND BEING ALL OF "TRACT 3" OF WEST POINT, SECTION I, AS RECORDED IN VOLUME 156, PAGE 42,

HARRIS COUNTY MAP RECORDS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A SET 5/8 INCH CAPPED IRON ROD STAMPED SOUTH TEXAS SURVEYING MARKING THE SOUTHWEST CORNER OF SAID WEST POINT, SECTION 1;

THENCE, NORTH 00 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 317.00 FEET TO A FOUND 5/8 INCH CAPPED IRON ROD STAMPED SOUTH TEXAS SURVEYING;

THENCE, NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 421.09 FEET TO A FOUND "X";

THENCE, SOUTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 317.00 FEET TO A FOUND NAIL IN SHINER;

THENCE, SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 421.09 FEET TO THE POINT OF BEGINNING AND CONTAINING 3.064 ACRES (133,486 SQUARE FEET) OF LAND.

**TRACT 4:**

3.064 ACRES OF LAND LOCATED IN THE JOHN TAYLOR LEAGUE, ABSTRACT NUMBER 72, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, AND BEING ALL OF "TRACT 4" OF WEST POINT, SECTION I, AS RECORDED IN VOLUME 156, PAGE 42, HARRIS COUNTY MAP RECORDS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND "X" MARKING THE NORTHEAST CORNER OF SAID "TRACT 4" AND BEING IN THE WESTERLY RIGHT-OF-WAY LINE OF LAZY HOLLOW DRIVE (60-FOOT WIDTH), AS RECORDED IN VOLUME 153, PAGE 50, HARRIS COUNTY MAP RECORDS;

THENCE, SOUTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 317 .00 FEET TO A SET "X";

THENCE, SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 421.09 FEET TO A SET 5/8 INCH CAPPED IRON ROD STAMPED SOUTH TEXAS SURVEYING;

THENCE, NORTH 00 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 317.00 FEET TO A SET 5/8 INCH CAPPED IRON ROD STAMPED SOUTH TEXAS SURVEYING;

THENCE, NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 421.09 FEET TO THE POINT OF BEGINNING AND CONTAINING 3.064 ACRES (133,486 SQUARE FEET) OF LAND.

**TRACT 5:**

3.044 ACRES OF LAND LOCATED IN THE JOHN TAYLOR LEAGUE, ABSTRACT NUMBER 72, HARRIS COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT AN "X" FOUND FOR THE INTERSECTION OF THE WEST RIGHT-OF-WAY LINE OF LAZY HOLLOW DRIVE (60-FOOT WIDTH) AS RECORDED IN VOLUME 153, PAGE 50, HARRIS COUNTY MAP RECORDS, WITH THE NORTHERLY LINE OF WEST POINT, SECTION I, AS RECORDED IN VOLUME 156, PAGE 42, HARRIS COUNTY MAP RECORDS:

THENCE, SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 421.09 FEET, ALONG THE SAID NORTHERLY LINE OF WEST POINT, SECTION I, TO A SET 5/8 INCH CAPPED IRON ROD STAMPED SOUTH TEXAS SURVEYING;

THENCE, NORTH, A DISTANCE OF 287.67 FEET TO A SET 5/8 INCH CAPPED IRON ROD STAMPED SOUTH TEXAS SURVEYING IN THE SOUTHERLY RIGHT-OF-WAY LINE OF WOODWAY DRIVE (60-FOOT WIDTH) AS RECORDED IN VOLUME 153, PAGE 50, HARRIS COUNTY MAP RECORDS;

THENCE, ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID WOODWAY DRIVE AND THE WESTERLY RIGHT-OF-WAY LINE OF SAID LAZY HOLLOW DRIVE THE FOLLOWING COURSES:

NORTHEASTERLY ALONG THE ARC OF A TANGENT CURVE TO THE LEFT, HAVING A RADIUS OF 964.58 FEET, A CENTRAL ANGLE OF 23 DEGREES 05 MINUTES 56 SECONDS AND AN ARC DISTANCE OF 388.87 FEET TO A FOUND 5/8 INCH IRON ROD;

SOUTH 70 DEGREES 28 MINUTES 30 SECONDS EAST, A DISTANCE OF 14.14 FEET TO A SET 5/8 INCH CAPPED IRON ROD STAMPED SOUTH TEXAS SURVEYING FOR POINT OF CURVATURE;

SOUTHEASTERLY, ALONG THE ARC OF A TANGENT CURVE TO THE RIGHT, HAVING A RADIUS OF 301.79 FEET, A CENTRAL ANGLE OF 25 DEGREES 28 MINUTES 30 SECONDS AND AN ARC DISTANCE OF 134.18 FEET TO A SET "X" FOR POINT OF TANGENCY;

SOUTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 230.47 FEET TO THE POINT OF BEGINNING AND CONTAINING 3.044 ACRES (132,609 SQUARE FEET) OF LAND.

**TRACT 6:**

4.8343 ACRES OF LAND LOCATED IN THE JOHN TAYLOR LEAGUE, ABSTRACT NUMBER 72, HARRIS COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT AN "X" FOUND FOR THE INTERSECTION OF THE NORTHERLY LINE OF WEST POINT, SECTION I, AS RECORDED IN VOLUME 156, PAGE 42, HARRIS COUNTY MAP RECORDS WITH THE EAST RIGHT-OF-WAY LINE OF LAZY HOLLOW DRIVE (60-FOOT WIDTH) AS RECORDED IN VOLUME 153, PAGE 50, HARRIS COUNTY MAP RECORDS;

THENCE, ALONG THE EAST RIGHT-OF-WAY LINE OF SAID LAZY HOLLOW DRIVE AND THE SOUTHERLY RIGHT-OF-WAY LINE OF WOODWAY DRIVE (60-FOOT WIDTH) AS RECORDED IN VOLUME 153, PAGE 50, HARRIS COUNTY MAP RECORDS;

NORTH 00 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 230.47 FEET TO AN "X" SET FOR POINT-OF-CURVATURE;

NORTHWESTERLY ALONG THE ARC OF A CURVE TO THE LEFT, HAVING A RADIUS OF 361.79 FEET, A CENTRAL ANGLE OF 25 DEGREES 28 MINUTES 30 SECONDS AND AN ARC OF LENGTH OF 160.86 FEET TO A FOUND "X"; NORTH 19 DEGREES 31 MINUTES 30 SECONDS EAST, A DISTANCE OF 14.14 FEET TO A FOUND "X";

NORTHEASTERLY, ALONG THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 964.58 FEET, A CENTRAL ANGLE OF 02 DEGREES 05 MINUTES 15 SECONDS AND AN ARC LENGTH OF 35.14 FEET TO A 5/8 INCH CAPPED IRON ROD STAMPED SOUTH TEXAS SURVEYING SET FOR THE POINT-OF-REVERSE-CURVATURE;

NORTHEASTERLY, ALONG THE ARC OF A CURVE TO THE RIGHT, HAVING A RADIUS OF 844.58 FEET, A CENTRAL ANGLE OF 30 DEGREES 00 MINUTES 14 SECONDS AND AN ARC LENGTH OF 442.28 FEET TO A 5/8 INCH CAPPED IRON ROD STAMPED SOUTH TEXAS SURVEYING SET;

THENCE, SOUTH 00 DEGREES 04 MINUTES 00 SECONDS WEST, A DISTANCE OF 529.10 FEET TO A 5/8 INCH CAPPED IRON ROD STAMPED SOUTH TEXAS SURVEYING SET FOR THE NORTHEAST CORNER OF SAID WEST POINT, SECTION 1;

THENCE, SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, ALONG THE NORTHERLY LINE OF SAID WEST POINT, SECTION 1, A DISTANCE OF 422.16 FEET TO THE POINT OF BEGINNING AND CONTAINING 4.8343 ACRES (210,583 SQUARE FEET) OF LAND.

**TRACT 7:**

2.827 ACRES OF LAND LOCATED IN THE JOHN TAYLOR LEAGUE, ABSTRACT NUMBER 72, HARRIS COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT AN "X" SET MARKING THE MOST SOUTHERLY END OF A CUTBACK CORNER AT THE INTERSECTION OF THE WEST RIGHT-OF-WAY LINE OF LAZY HOLLOW DRIVE (60-FOOT WIDTH), AS RECORDED IN VOLUME 153, PAGE 50, HARRIS COUNTY MAP RECORDS, WITH THE NORTHERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (120-FOOT WIDTH);

THENCE, SOUTH 89 DEGREES 27 MINUTES 30 SECONDS, WEST, A DISTANCE OF 411.11 FEET, ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID WESTHEIMER ROAD, TO A 5/8 INCH CAPPED IRON ROD STAMPED SOUTH TEXAS SURVEYING FOR CORNER;

THENCE, NORTH 00 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 294.53 FEET, PARALLEL WITH SAID LAZY HOLLOW DRIVE, TO A 5/8 INCH CAPPED IRON ROD STAMPED SOUTH TEXAS SURVEYING SET FOR THE SOUTHWEST CORNER OF WEST POINT, SECTION 1, AS RECORDED IN VOLUME 156, PAGE 42, HARRIS COUNTY MAP RECORDS;

THENCE, NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 421.09 FEET ALONG THE SOUTHERLY LINE OF SAID WEST POINT, SECTION 1, TO A NAIL FOUND IN THE WEST RIGHT-OF-WAY LINE OF SAID LAZY HOLLOW DRIVE;

THENCE, SOUTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, ALONG THE WEST RIGHT-OF-WAY LINE OF SAID LAZY HOLLOW DRIVE A DISTANCE OF 280.55 FEET TO AN "X" SET FOR THE NORTHERLY CUTBACK RIGHT-OF-WAY CORNER OF THE NORTHWESTERLY INTERSECTION OF LAZY HOLLOW DRIVE WITH SAID WESTHEIMER ROAD;

THENCE, SOUTH 44 DEGREES 43 MINUTES 50 SECONDS WEST, ALONG SAID CUTBACK RIGHT-OF-WAY LINE A DISTANCE OF 14.21 FEET TO A POINT OF BEGINNING AND CONTAINING 2.827 ACRES (123,139 SQUARE FEET) OF LAND.

**TRACT 8:**

2.784 ACRES OF LAND LOCATED IN THE JOHN TAYLOR LEAGUE, ABSTRACT NUMBER 72, HARRIS COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A NAIL FOUND FOR THE INTERSECTION OF THE EAST RIGHT-OF-WAY LINE OF LAZY HOLLOW DRIVE (60-FOOT WIDTH) AS RECORDED IN VOLUME 153, PAGE 50, HARRIS COUNTY MAP RECORDS WITH THE SOUTHERLY LINE OF WEST POINT, SECTION 1, AS RECORDED IN VOLUME 156, PAGE 42, HARRIS COUNTY MAP RECORDS;

THENCE, NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST ALONG SAID SOUTHERLY LINE OF WEST POINT, SECTION 1, A DISTANCE OF 421.42 FEET TO A SET 5/8 INCH CAPPED IRON ROD STAMPED SOUTH TEXAS SURVEYING;

THENCE, SOUTH 00 DEGREES 04 MINUTES 00 SECONDS WEST, A DISTANCE OF 286.00 FEET TO A 5/8 INCH IRON ROD FOUND IN THE NORTHERLY RIGHT-OF-WAY LINE OF WESTHEIMER ROAD (120-FOOT WIDTH);

THENCE, SOUTH 89 DEGREES 27 MINUTES 30 SECONDS WEST, ALONG SAID NORTHERLY RIGHT-OF-WAY LINE A DISTANCE OF 411.11 FEET TO AN "X" SET FOR THE EASTERLY CUTBACK RIGHT-OF-WAY CORNER OF THE NORTHEASTERLY INTERSECTION CORNER OF SAID WESTHEIMER ROAD WITH SAID LAZY HOLLOW DRIVE;

THENCE, NORTH 45 DEGREES 16 MINUTES 20 SECONDS WEST, ALONG SAID CUTBACK RIGHT-OF-WAY LINE, A DISTANCE OF 14.08 FEET TO AN "X" SET FOR THE NORTH END OF SAID CUTBACK IN THE EASTERLY RIGHT-OF-WAY LINE OF SAID LAZY HOLLOW DRIVE;

THENCE, NORTH 00 DEGREES 00 MINUTES 00 SECONDS WEST, ALONG THE EASTERLY RIGHT-OF-WAY LINE, A DISTANCE OF 279.98 FEET TO THE POINT OF BEGINNING AND CONTAINING 2.784 ACRES (121,268 SQUARE FEET) OF LAND.

**TRACT 9:**

4.4226 ACRES BEING UNRESTRICTED RESERVE "A", BLOCK 1 OF CREEKSIDE APARTMENTS, REPLAT NO. 3, A SUBDIVISION IN HARRIS COUNTY, TEXAS, ACCORDING TO A MAP OR PLAT THEREOF UNDER HARRIS COUNTY FILM CODE NO. 669224 OF THE MAP RECORDS OF HARRIS COUNTY, TEXAS.

# EXHIBIT B



# Madison Title Agency, LLC

4801 Woodway Dr Suite 430W
Houston, TX 77056

Borrower(s):       Piney Point 2023, LLC
Property Address:  2501 Lazy Hollow Dr #1094, Houston, TX 77063
Settlement Date:   6/8/2023
File Number:       184891T

| Borrower Charge | Borrower Credit | Description |
|---|---|---|
| | | **New Loan(s):** |
| | 73,893,000.00 | from JLL Real Estate Capital, LLC |
| | | |
| | | **Lender Fees:** |
| | 589,107.50 | Borrower Deposits |
| 294,465.00 | | Lender Origination Fee to JLL |
| 36,946.50 | | Fannie Mae Delivery Fee to JLL |
| 7,500.00 | | JLL Processing Fee |
| 248,321.53 | | Prepaid Interest (23 days at $10,796.59/day) to JLL |
| 1,122,524.67 | | Tax Escrow Initial Deposit to JLL |
| 340,000.00 | | Insurance Escrow Initial Deposit to JLL |
| 690,000.00 | | Replacement Reserve Escrow Deposit to JLL |
| 2,044,000.00 | | Repair Escrow Deposit to JLL |
| | | |
| | | |
| | | **Loan Payoff(s):** |
| 73,651,569.90 | | to Wells Fargo |
| | | |
| | | |
| | | **Title Fees:** |
| 77,650.00 | | Title Insurance Premium- LP $154,967 - $77,317 R8 Credit |
| | | Endorsements |
| 20.00 | | T-30 |
| 5.00 | | T-3 |
| 15,496.70 | | T-19 |
| 100.00 | | T-23 |
| 25.00 | | T-36 |
| 100.00 | | T-25.1 |
| | | *Disclosure Required by Article 9.53 Texas Insurance Code:* |
| | | *Old Republic: $14,009.51* |
| | | *Reimb. to MTA for Title Evidence to Old Republic: $500* |
| | | *Madison Title Agency, LLC: $78,887.19* |
| 500.00 | | Escrow Fee |
| 450.00 | | Recording Fees |
| 2.00 | | Guaranty Fee to TDI |
| 70.00 | | Tax Certificate to Altitude Tax |
| | | |



# Madison Title Agency, LLC

4801 Woodway Dr Suite 430W
Houston, TX 77056

Borrower(s):           Piney Point 2023, LLC
Property Address:      2501 Lazy Hollow Dr #1094, Houston, TX 77063
Settlement Date:       6/8/2023
File Number:           184891T

| | | Disbursements: |
|---|---|---|
| 5,000.00 | | Appraisal Fee to JLL Valuation |
| 2,300.00 | | Phase I to BBG |
| 3,100.00 | | PCNA to BBG |
| 953.50 | | Zoning Report to BBG |
| 30,000.00 | | Lender Legal Fee to Moss & Barnett |
| 450.00 | | Doc Prep Fee to Henley & Henley |
| 900.00 | | Search Fees to First American |
| 11,000.00 | | Escrow Held by Madison Title Agency |
| 2,362.50 | | Legal Fee to Atik Law PLLC |
| | | |
| | | |
| | | |
| 78,585,812.30 | 74,482,107.50 | Totals |
| | | |
| 4,103,704.80 | | **Cash from Borrower** |





# Madison Title Agency, LLC

4801 Woodway Dr Suite 430W
Houston, TX 77056

Borrower(s):       Piney Point 2023, LLC
Property Address:  2501 Lazy Hollow Dr #1094, Houston, TX 77063
Settlement Date:   6/8/2023
File Number:       184891T

Borrower understands the Closing or Escrow Agent has assembled this information representing the transaction from the best information available from other sources and cannot guarantee the accuracy thereof. The Lender involved may be furnished a copy of this Statement. The undersigned hereby authorizes Madison Title Agency, LLC to make expenditures and disbursements as shown above and approves same for payment. The undersigned also acknowledges receipt of Loan Funds, if applicable, in the amount shown above and a receipt of a copy of this Statement.

*NOTE: Interest of existing liens is figured to the date indicated. If not paid by then, additional interest will have to be collected and your statement will be adjusted to have sufficient funds to secure release from the lienholder.

**Borrower(s):**

*Piney Point 2023, LLC*

By: _____

Name: _____

Title: _____

**Settlement Agent:**

*Madison Title Agency, LLC*

By: _____

Name: _____

Title: _____

# EXHIBIT C

# FEMA-4781-DR, Texas Disaster Declaration as of 09/23/2024







**Data Layer/Map Description:**
The types of assistance that have been designated for selected areas in the State of Texas.

All areas in the State of Texas are eligible to apply for assistance under the Hazard Mitigation Grant Program.

## Designated Counties

| | |
|---|---|
| ☐ | No Designation |
| ☐ | Individual Assistance |
| ☐ | Public Assistance (Category B) |
| ☒ | Public Assistance (Categories A - G) |
| ☐ | Individual Assistance and Public Assistance (Category B) |
| ☒ | Individual Assistance and Public Assistance (Categories A - G) |



**Data Sources:**
FEMA, ESRI;
Initial Declaration: 05/17/2024
Disaster Federal Registry Notice:
Amendment #18: 09/23/2024
Datum: North American 1983
Projection: Lambert Conformal Conic

MapID 3232e366cdc0923242246twhqprod

# FEMA-4798-DR, Texas Disaster Declaration as of 09/16/2024







**Data Layer/Map Description:**
The types of assistance that have been designated for selected areas in the State of Texas.

All areas in the State of Texas are eligible to apply for assistance under the Hazard Mitigation Grant Program.

**Designated Counties**

| | |
|---|---|
| ☐ | No Designation |
| ☐ | Public Assistance (Categories A and B) |
| ☒ | Public Assistance (Categories A - G) |
| ☐ | Individual Assistance and Public Assistance (Categories A and B) |
| ☒ | Individual Assistance and Public Assistance (Categories A - G) |



0  40  80  120  160
Miles

**Data Sources:**
FEMA, ESRI;
Initial Declaration: 07/09/2024
Disaster Federal Registry Notice:
Amendment #6: 09/16/2024
Datum: North American 1983
Projection: Lambert Conformal Conic

MapID 3daa7a429940917240945twhqprod

# EXHIBIT D

## (a)    Use of Property.

From and after the Effective Date, Borrower shall not, unless required by applicable law or Governmental Authority:

        (1)    change the use of all or any part of the Mortgaged Property;

        (2)    convert any individual dwelling units or common areas to commercial use, or convert any common area or commercial use to individual dwelling units;

        (3)    initiate or acquiesce in a change in the zoning classification of the Land;

        (4)    establish any condominium or cooperative regime with respect to the Mortgaged Property;

        (5)    subdivide the Land; or

        (6)    suffer, permit, or initiate the joint assessment of the Mortgaged Property with any other real property constituting a tax lot separate from the Mortgaged Property which could cause the part of the Land to be included or assessed under or as part of another tax lot or parcel, or any part of any other property to be included or assessed under or as part of the tax lot or parcels for the Land.

## (zz)    Property Maintenance.

Borrower shall:

        (1)    pay the expenses of operating, managing, maintaining, and repairing the Mortgaged Property (including insurance premiums, utilities, Repairs, and Replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added;

        (2)    keep the Mortgaged Property in good repair and marketable condition (ordinary wear and tear excepted) (including the replacement of Personalty and Fixtures with items of equal or better function and quality unless such items are no longer required in connection with operation of the Mortgaged Property) and subject to Section 9.03(b)(3) and Section 10.03(d) restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition or condition immediately prior to the damage (if improved after the Effective Date), whether or not any insurance proceeds received upon an event of loss or any amounts received in connection with a Condemnation Action are available to cover any costs of such restoration or repair;

        (3)    commence all Required Repairs, Additional Lender Repairs, and Additional Lender Replacements as follows:

(A)	with respect to any Required Repairs, promptly following the Effective Date (subject to Force Majeure, if applicable), in accordance with the timelines set forth on the Required Repair Schedule, or if no timelines are provided, as soon as practical following the Effective Date;

(B)	with respect to Additional Lender Repairs, in the event that Lender determines that Additional Lender Repairs are necessary from time to time or pursuant to Section 6.03(c), promptly following Lender's written notice of such Additional Lender Repairs (subject to Force Majeure, if applicable), commence any such Additional Lender Repairs in accordance with Lender's timelines, or if no timelines are provided, as soon as practical; and

(C)	with respect to Additional Lender Replacements, in the event that Lender determines that Additional Lender Replacements are necessary from time to time or pursuant to Section 6.03(c), promptly following Lender's written notice of such Additional Lender Replacements (subject to Force Majeure, if applicable), commence any such Additional Lender Replacements in accordance with Lender's timelines, or if no timelines are provided, as soon as practical;

(4)	make, construct, install, diligently perform, and complete all Replacements, Repairs, Restoration, and any other work permitted under the Loan Documents:

(A)	in a good and workmanlike manner as soon as practicable following the commencement thereof, free and clear of any Liens, including mechanics' or materialmen's liens and encumbrances (except Permitted Encumbrances and mechanics' or materialmen's liens which attach automatically under the laws of any Governmental Authority upon the commencement of any work upon, or delivery of any materials to, the Mortgaged Property and for which Borrower is not delinquent in the payment for any such work or materials);

(B)	in accordance with all applicable laws, ordinances, rules, and regulations of any Governmental Authority, including applicable building codes, special use permits, and environmental regulations;

(C)	in accordance with all applicable insurance and bonding requirements; and

(D)	within all timeframes required by Lender, and Borrower acknowledges that it shall be an Event of Default if Borrower abandons or ceases work on any Repair at any time prior to the completion of the Repairs for a period of longer than twenty (20) days (except when Force Majeure exists and Borrower is diligently pursuing the reinstitution of such work, provided, however, any such abandonment or cessation shall not in any event allow the Repair to be completed after the Completion Period, subject to Force Majeure);

"**Event of Default**" means the occurrence of any event listed in Section 14.01 (Events of Default) of the Loan Agreement.

"**Exceptions to Representations and Warranties Schedule**" means that certain Schedule 7 (Exceptions to Representations and Warranties Schedule) to the Loan Agreement.

"**First Payment Date**" has the meaning set forth in the Summary of Loan Terms.

"**First Principal and Interest Payment Date**" has the meaning set forth in the Summary of Loan Terms, if applicable.

"**Fixed Investment Trust**" means an investment trust as defined in Section 301.7701-4 of the Treasury Regulations.

"**Fixed Rate**" has the meaning set forth in the Summary of Loan Terms.

"**Fixtures**" has the meaning set forth in the Security Instrument.

"**Force Majeure**" shall mean acts of God, acts of war, civil disturbance, governmental action (including the revocation or refusal to grant licenses or permits, where such revocation or refusal is not due to the fault of Borrower), strikes, lockouts, fire, unavoidable casualties or any other causes beyond the reasonable control of Borrower (other than lack of financing), and of which Borrower shall have notified Lender in writing within ten (10) days after its occurrence.

"**Foreclosure Event**" means:

    (a)    foreclosure under the Security Instrument;

    (b)    any other exercise by Lender of rights and remedies (whether under the Security Instrument or under applicable law, including Insolvency Laws) as holder of the Mortgage Loan and/or the Security Instrument, as a result of which Lender (or its designee or nominee) or a third party purchaser becomes owner of the Mortgaged Property;

    (c)    delivery by Borrower to Lender (or its designee or nominee) of a deed or other conveyance of Borrower's interest in the Mortgaged Property in lieu of any of the foregoing; or

    (d)    in Louisiana, any dation en paiement.

"**Goods**" has the meaning set forth in the Security Instrument.

"**Governmental Authority**" means any court, board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any court, board, commission, department or body of any municipal, county, state or federal governmental unit, that has or acquires jurisdiction over Borrower or the Mortgaged Property or the use, operation or improvement of the Mortgaged Property.

# EXHIBIT E

# Wire Transfer Services
## Outgoing Wire Transfer Request



| Today's Date: | | | Wells Fargo Reference Number: |
|---|---|---|---|
| 02/13/2025 | | | FW0068510044686651 |
| Banker Name: | | | Officer/Portfolio Number: |
| ALEX WILLIAMS | | | CH885 |
| Banker Phone: | Branch Number: | Banker AU: | Banker MAC: |
| 713/785-5343 | 07911 | 0068510 | T0029-010 |

Outgoing wires can only be sent for Wells Fargo customers. Provide the Customer Copy to the customer ensuring you give them the Wire Transfer Agreement on pages 3 and 4. Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See the Wire Transfer Information for explanations of the Mexican CLABE number, the SWIFT BIC, the International Routing Code ("IRC"), Indian Financial System Code (IFSC) and the International Bank Account Number ("IBAN").

## Originator's Information

| Originator Name: | | | Street Address: | |
|---|---|---|---|---|
| FERCAN E KALKAN | | | 143 MANOR LAKE ESTATES DR | |
| Primary ID Type: | Primary ID Description: | | Address Line 2: | |
| PINV WS | PIN Validation | | | |
| Primary ID St/Ctry/Prov: | Primary ID Issue Date: | Primary ID Expiration Date: | Address Line 3: | |
| | NONE | NONE | | |
| Secondary ID Type: | Secondary ID Description: | | City: | State: |
| ALID PR | SRC1914350195 | | SPRING | TX |
| Secondary ID State/Country: | Secondary ID Issue Date: | Secondary ID Expiration Date: | ZIP/Postal Code: | Country: |
| | 09/15/2023 | 09/15/2033 | 77379-3722 | US |
| Account Name: | | | Home Phone: | Business Phone: |
| PINEY POINT 2023 LLC | | | | 281/770-3113 |

## Wire Amount and Source of Funds

| Create AU: | Amount (US Dollars): | Debit Wells Fargo Account: | Bank/COID: |
|---|---|---|---|
| 0068510 | $546,927.02 | 2791635127 | 00808 |

## Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds)

| Beneficiary/Recipient Name: | Name/Address Line 1: |
|---|---|
| JLL COLLECTION CLEARING ACCTNOT PRO | |
| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): | Name/Address Line 2: |
| 1029098683 | |
| Purpose of Funds: | Name/Address Line 3: |
| Mortgage payment | PITTSBURGH, PA, US |
| | Beneficiary Phone Number: |
| Additional Instructions: | |
| Loan number 68190 | |

## Beneficiary Bank (This is the financial institution where the beneficiary maintains their account.)

| ABA/RTN | SWIFT/BIC: | Beneficiary Bank Name: | | |
|---|---|---|---|---|
| 043000096 | | PNC BANK, NATIONAL ASSOCIATION | | |
| Beneficiary Bank Address: | | City: | State: | |
| | | WILMINGTON | DE | |
| Additional Instructions: | | | | |
| | | | | |

WTR6603 (11-24 SVP)

## Wire Fees

Wells Fargo wire transfer fees will be charged to the Originator's Debit Account. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments and, if applicable, on the Wells Fargo Combined Disclosure for Outgoing Consumer International Wires. Additional fees from intermediary and beneficiary banks may be charged to international transactions. My signature here indicates agreement to all of the information on this Outgoing Wire Transfer Request and to the terms and conditions of this request. Wells Fargo is authorized to rely on the information on this Request in making the requested funds transfer.

Wells Fargo Wire Fee Amount:

$40.00

## Customer Signature

I'm sure this isn't a scam, and I'd like to send my wire.

Originator Name

FERCAN E KALKAN

Originator Signature

☐ Submit manually

☐ Signature not required

Date:

02/13/2025

WTR6603 (11-24 SVP)

# Wire Transfer Services
Outgoing Wire Transfer Request



| Today's Date: | | | Wells Fargo Reference Number: | |
|---|---|---|---|---|
| 03/10/2025 | | | FW0068510069914962 | |
| Banker Name: | | | Officer/Portfolio Number: | |
| SAM QUANG CHUNG | | | A3140 | |
| Banker Phone: | Branch Number: | Banker AU: | Banker MAC: | |
| 713/785-5343 | 07911 | 0068510 | T0029-010 | |

Outgoing wires can only be sent for Wells Fargo customers. Provide the Customer Copy to the customer ensuring you give them the Wire Transfer Agreement on pages 3 and 4. Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See the Wire Transfer Information for explanations of the Mexican CLABE number, the SWIFT BIC, the International Routing Code ("IRC"), Indian Financial System Code (IFSC) and the International Bank Account Number ("IBAN").

## Originator's Information

| Originator Name: | | | Street Address: | |
|---|---|---|---|---|
| FERCAN E KALKAN | | | 143 MANOR LAKE ESTATES DR | |
| Primary ID Type: | Primary ID Description: | | Address Line 2: | |
| ALID PR | SRC1914350195 | | | |
| Primary ID St/Ctry/Prov: | Primary ID Issue Date: | Primary ID Expiration Date: | Address Line 3: | |
| | 09/15/2023 | 09/15/2033 | | |
| Secondary ID Type: | Secondary ID Description: | | City: | State: |
| PINV NS | PIN Validation | | SPRING | TX |
| Secondary ID State/Country: | Secondary ID Issue Date: | Secondary ID Expiration Date: | ZIP/Postal Code: | Country: |
| | NONE | NONE | 77379-3722 | US |
| Account Name: | | | Home Phone: | Business Phone: |
| PINEY POINT 2023 LLC | | | | 281/770-3113 |

## Wire Amount and Source of Funds

| Create AU: | Amount (US Dollars): | Debit Wells Fargo Account: | Bank/COID: |
|---|---|---|---|
| 0068510 | $430,461.46 | 2791635127 | 00808 |

## Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds)

| Beneficiary/Recipient Name: | Name/Address Line 1: |
|---|---|
| JLL COLLECTION CLEARING ACCTNOT PRO | |
| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): | Name/Address Line 2: |
| 1029098683 | |
| Purpose of Funds: | Name/Address Line 3: |
| MORTGAGE PAYMENT | PITTSBURGH, PA, US |
| | Beneficiary Phone Number: |
| Additional Instructions: | |
| LOAN NUMBER 68190 | |

## Beneficiary Bank (This is the financial institution where the beneficiary maintains their account.)

| ABA/RTN | SWIFT/BIC: | Beneficiary Bank Name: | |
|---|---|---|---|
| 043000096 | | PNC BANK, NATIONAL ASSOCIATION | |
| Beneficiary Bank Address: | | City: | State: |
| | | WILMINGTON | DE |
| Additional Instructions: | | | |
| | | | |



WTR6603 (11-24 SVP)

## Wire Fees

Wells Fargo wire transfer fees will be charged to the Originator's Debit Account. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments and, if applicable, on the Wells Fargo Combined Disclosure for Outgoing Consumer International Wires. Additional fees from intermediary and beneficiary banks may be charged to international transactions. My signature here indicates agreement to all of the information on this Outgoing Wire Transfer Request and to the terms and conditions of this request. Wells Fargo is authorized to rely on the information on this Request in making the requested funds transfer.

Wells Fargo Wire Fee Amount:

$40.00

## Customer Signature

I'm sure this isn't a scam, and I'd like to send my wire.

Originator Name

FERCAN E KALKAN

Originator Signature

☐ Submit manually

☐ Signature not required

Date:

03/10/2025

WTR6603 (11-24 SVP)

# Wire Transfer Services

Outgoing Wire Transfer Request



**WELLS FARGO**

| | |
|---|---|
| Today's Date: | Wells Fargo Reference Number: |
| 04/04/2025 | FW0068510094932993 |
| Banker Name: | Officer/Portfolio Number: |
| SAM QUANG CHUNG | A3140 |

| Banker Phone: | Branch Number: | Banker AU: | Banker MAC: |
|---|---|---|---|
| 713/785-5343 | 07911 | 0068510 | T0029-010 |

Outgoing wires can only be sent to Wells Fargo customers. Provide the Customer Copy to the customer ensuring you give them the Wire Transfer Agreement on pages 3 and 4. Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See the Wire Transfer Information for explanations of the Mexican CLABE number, the SWIFT BIC, the International Routing Code ("IRC"), Indian Financial System Code (IFSC) and the International Bank Account Number ("IBAN").

## Originator's Information

| Authorized Party Name: | | Street Address: | |
|---|---|---|---|
| FERCAN E KALKAN | | 143 MANOR LAKE ESTATES DR | |
| Primary ID Type: | Primary ID Description: | Address Line 2: | |
| ALID PR | SRC1914350195 | | |
| Primary ID St/Ctry/Prov: | Primary ID Issue Date: | Primary ID Expiration Date: | Address Line 3: |
| | 09/15/2023 | 09/15/2033 | |
| Secondary ID Type: | Secondary ID Description: | City: | State: |
| PINV NS | PIN Validation | SPRING | TX |
| Secondary ID State/Country: | Secondary ID Issue Date: | Secondary ID Expiration Date: | ZIP/Postal Code: | Country: |
| | NONE | NONE | 773793722 | |
| Home Phone: | | Business Phone: | |
| | | 281/770-3113 | |
| Originator Name: | | | |
| PINEY POINT 2023 LLC | | | |

## Wire Amount and Source of Funds

| Create AU: | Amount (US Dollars): | Debit Wells Fargo Account: | Bank/COID: |
|---|---|---|---|
| 0068510 | $504,694.24 | 2791635127 | 00808 |

## Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds)

| Beneficiary/Recipient Name: | Name/Address Line 1: |
|---|---|
| JLL COLLECTION CLEARING ACCTNOT PRO | |
| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): | Name/Address Line 2: |
| 1029098683 | |
| Purpose of Funds: | Name/Address Line 3: |
| MORTGAGE PAYMENT | PITTSBURGH, PA, US |
| | Beneficiary Phone Number: |
| Additional Instructions: | |
| LOAN NUMBER 68190 | |



Customer Copy

WTR6603 (3-25 SVP)

**Beneficiary Bank** (This is the financial institution where the beneficiary maintains their account.)

| ABA/RTN | SWIFT/BIC: | Beneficiary Bank Name: |
|---|---|---|
| 043000096 | | PNC BANK, NATIONAL ASSOCIATION |

| Beneficiary Bank Address: | City: | State: |
|---|---|---|
| | WILMINGTON | DE |

Additional Instructions:

## Wire Fees

Wells Fargo wire transfer fees will be charged to the Originator's Debit Account. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments and, if applicable, on the Wells Fargo Combined Disclosure for Outgoing Consumer International Wires. Additional fees from intermediary and beneficiary banks may be charged to international transactions. My signature here indicates agreement to all of the information on this Outgoing Wire Transfer Request and to the terms and conditions of this request. Wells Fargo is authorized to rely on the information on this Request in making the requested funds transfer.

Wells Fargo Wire Fee Amount:

$40.00

## Authorized Party Signature

I'm sure this isn't a scam, and I'd like to send my wire.

Authorized Party Name

FERCAN E KALKAN

Authorized Party Signature



☐ Submit manually

☐ Signature not required

Date:

04/04/2025

Customer Copy

WTR6603 (3-25 SVP)

# Wire Transfer Services
Outgoing Wire Transfer Request



| | |
|---|---|
| Today's Date:<br>05/07/2025 | Wells Fargo Reference Number:<br>FW0068510127163255 |
| Banker Name:<br>MONICA CASTILLO | Officer/Portfolio Number:<br>L7911 |

| Banker Phone:<br>713/785-5343 | Branch Number:<br>07911 | Banker AU:<br>0068510 | Banker MAC:<br>T0029-010 |
|---|---|---|---|

Outgoing wires can only be sent to Wells Fargo customers. Provide the Customer Copy to the customer ensuring you give them the Wire Transfer Agreement on pages 3 and 4. Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See the Wire Transfer Information for explanations of the Mexican CLABE number, the SWIFT BIC, the International Routing Code ("IRC"), Indian Financial System Code (IFSC) and the International Bank Account Number ("IBAN").

## Originator's Information

| Authorized Party Name:<br>FERCAN E KALKAN | | Street Address:<br>143 MANOR LAKE ESTATES DR | |
|---|---|---|---|
| Primary ID Type:<br>PINV WS | Primary ID Description:<br>PIN Validation | Address Line 2: | |
| Primary ID St/Ctry/Prov: | Primary ID Issue Date:<br>NONE | Primary ID Expiration Date:<br>NONE | Address Line 3: |
| Secondary ID Type:<br>ALID PR | Secondary ID Description:<br>SRC1914350195 | City:<br>SPRING | State:<br>TX |
| Secondary ID State/Country: | Secondary ID Issue Date:<br>09/15/2023 | Secondary ID Expiration Date:<br>09/15/2033 | ZIP/Postal Code:<br>773793722 | Country: |
| Home Phone: | | Business Phone:<br>281/770-3113 | |

Originator Name:
PINEY POINT 2023 LLC

## Wire Amount and Source of Funds

| Create AU:<br>0068510 | Amount (US Dollars):<br>$323,897.65 | Debit Wells Fargo Account:<br>2791635127 | Bank/COID:<br>00808 |
|---|---|---|---|

## Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds)

| Beneficiary/Recipient Name:<br>JLL COLLECTION CLEARING ACCNOT PRO | Name/Address Line 1: |
|---|---|
| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico):<br>1029098683 | Name/Address Line 2: |
| Purpose of Funds:<br>LOAN NUMBER 68190 | Name/Address Line 3:<br>PITTSBURGH, PA, US |
| | Beneficiary Phone Number: |
| Additional Instructions: | |

# Customer Copy

WTR6603 (3-25 SVP)

## Beneficiary Bank (This is the financial institution where the beneficiary maintains their account.)

| ABA/RTN | SWIFT/BIC: | Beneficiary Bank Name: |
|---|---|---|
| 043000096 | | PNC BANK, NATIONAL ASSOCIATION |

| Beneficiary Bank Address: | City: | State: |
|---|---|---|
| | WILMINGTON | DE |

Additional Instructions:

## Wire Fees

Wells Fargo wire transfer fees will be charged to the Originator's Debit Account. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments and, if applicable, on the Wells Fargo Combined Disclosure for Outgoing Consumer International Wires. Additional fees from intermediary and beneficiary banks may be charged to international transactions. My signature here indicates agreement to all of the information on this Outgoing Wire Transfer Request and to the terms and conditions of this request. Wells Fargo is authorized to rely on the information on this Request in making the requested funds transfer.

Wells Fargo Wire Fee Amount:

$40.00

## Authorized Party Signature

I'm sure this isn't a scam, and I'd like to send my wire.

Authorized Party Name

FERCAN E KALKAN

Authorized Party Signature

☐ Submit manually

☐ Signature not required

Date:

05/07/2025

# Customer Copy

WTR6603 (3-25 SVP)

# Wire Transfer Services

Outgoing Wire Transfer Request



| Today's Date: | | | Wells Fargo Reference Number: |
|---|---|---|---|
| 06/09/2025 | | | FW006851016089189G |
| Banker Name: | | | Officer/Portfolio Number: |
| ALEJANDRO OROZCO | | | B7888 |
| Banker Phone: | Branch Number: | Banker AU: | Banker MAC: |
| 713/785-5343 | 07911 | 0068510 | T0029-010 |

Outgoing wires can only be sent for Wells Fargo customers. Provide the Customer Copy to the customer ensuring you give them the Wire Transfer Agreement on pages 3 and 4. Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See the Wire Transfer Information for explanations of the Mexican CLABE number, the SWIFT BIC, the International Routing Code ("IRC"), Indian Financial System Code (IFSC) and the International Bank Account Number ("IBAN").

## Originator's Information

| Authorized Party Name: | | | Street Address: | |
|---|---|---|---|---|
| FERCAN E KALKAN | | | 143 MANOR LAKE ESTATES DR | |
| Primary ID Type: | Primary ID Description: | | Address Line 2: | |
| PINV WS | PIN Validation | | | |
| Primary ID St/Ctry/Prov: | Primary ID Issue Date: | Primary ID Expiration Date: | Address Line 3: | |
| | NONE | NONE | | |
| Secondary ID Type: | Secondary ID Description: | | City: | State: |
| ALID PR | SRC1914350195 | | SPRING | TX |
| Secondary ID State/Country: | Secondary ID Issue Date: | Secondary ID Expiration Date: | ZIP/Postal Code: | Country: |
| | 09/15/2023 | 09/15/2033 | 773793722 | |
| Home Phone: | | | Business Phone: | |
| | | | 281/770-3113 | |
| Originator Name: | | | | |
| PINEY POINT 2023 LLC | | | | |

## Wire Amount and Source of Funds

| Create AU: | Amount (US Dollars): | Debit Wells Fargo Account: | Bank/COID: |
|---|---|---|---|
| 0068510 | $493,897.65 | 2791635127 | 00808 |

## Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds)

| Beneficiary/Recipient Name: | Name/Address Line 1: |
|---|---|
| JLL COLLECTION CLEARING ACCTNOT PRO | |
| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): | Name/Address Line 2: |
| 1029098683 | |
| Purpose of Funds: | Name/Address Line 3: |
| MORTGAGE PAYMENT 689190 | PITTSBURGH, PA, US |
| | Beneficiary Phone Number: |
| Additional Instructions: | |
| LOAN NUMBER 68190 | |

Customer Copy

WTR6603 (3-25 SVP)

## Beneficiary Bank (This is the financial institution where the beneficiary maintains their account.)

| ABA/RTN | SWIFT/BIC: | Beneficiary Bank Name: |
|---|---|---|
| 043000096 | | PNC BANK, NATIONAL ASSOCIATION |

| Beneficiary Bank Address: | City: | State: |
|---|---|---|
| | WILMINGTON | DE |

Additional Instructions:

## Wire Fees

Wells Fargo wire transfer fees will be charged to the Originator's Debit Account. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments and, if applicable, on the Wells Fargo Combined Disclosure for Outgoing Consumer International Wires. Additional fees from intermediary and beneficiary banks may be charged to international transactions. My signature here indicates agreement to all of the information on this Outgoing Wire Transfer Request and to the terms and conditions of this request. Wells Fargo is authorized to rely on the information on this Request in making the requested funds transfer.

Wells Fargo Wire Fee Amount:

$40.00

## Authorized Party Signature

I'm sure this isn't a scam, and I'd like to send my wire.

Authorized Party Name

FERCAN E KALKAN

Authorized Party Signature

☐ Submit manually
☐ Signature not required

Date:

06/09/2025

Customer Copy

WTR6603 (3-25 SVP)

# Wire Transfer Services
Outgoing Wire Transfer Request


WELLS FARGO

| Today's Date: | Wells Fargo Reference Number: |
|---|---|
| 07/07/2025 | FW0068510188447328 |

| Banker Name: | | Officer/Portfolio Number: |
|---|---|---|
| ALEJANDRO OROZCO | | B7888 |

| Banker Phone: | Branch Number: | Banker AU: | Banker MAC: |
|---|---|---|---|
| 713/785-5343 | 07911 | 0068510 | T0029-010 |

Outgoing wires can only be sent for Wells Fargo customers. Provide the Customer Copy to the customer ensuring you give them the Wire Transfer Agreement on pages 3 and 4. Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See the Wire Transfer Information for explanations of the Mexican CLABE number, the SWIFT BIC, the International Routing Code ("IRC"), Indian Financial System Code (IFSC) and the International Bank Account Number ("IBAN").

## Originator's Information

| Authorized Party Name: | | Street Address: | |
|---|---|---|---|
| FERCAN E KALKAN | | 143 MANOR LAKE ESTATES DR | |
| Primary ID Type: | Primary ID Description: | Address Line 2: | |
| ALID PR | SRC1914350195 | | |
| Primary ID St/Ctry/Prov.: | Primary ID Issue Date: | Primary ID Expiration Date: | Address Line 3: |
| | 09/15/2023 | 09/15/2033 | |
| Secondary ID Type: | Secondary ID Description: | City: | State: |
| PINV NS | PIN Validation | SPRING | TX |
| Secondary ID State/Country: | Secondary ID Issue Date: | Secondary ID Expiration Date: | ZIP/Postal Code: | Country: |
| | NONE | NONE | 773793722 | |
| Home Phone: | | Business Phone: | |
| | | 281/770-3113 | |
| Originator Name: | | | |
| PINEY POINT 2023 LLC | | | |

## Wire Amount and Source of Funds

| Create AU: | Amount (US Dollars): | Debit Wells Fargo Account: | Bank/COID: |
|---|---|---|---|
| 0068510 | $493,897.65 | 2791635127 | 00808 |

## Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds)

| Beneficiary/Recipient Name: | Name/Address Line 1: |
|---|---|
| JLL COLLECTION CLEARING ACCTNOT PRO | |
| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): | Name/Address Line 2: |
| 1029098683 | |
| Purpose of Funds: | Name/Address Line 3: |
| MORTGAGE PAYMENT 689190 | PITTSBURGH, PA, US |
| | Beneficiary Phone Number: |
| Additional Instructions: | |
| LOAN NUMBER 68190 | |

Customer Copy

Page 2 of 5

WTR6603 (3-25 SVP)

**Beneficiary Bank** (This is the financial institution where the beneficiary maintains their account.)

| ABA/RTN | SWIFT/BIC: | Beneficiary Bank Name: |
|---|---|---|
| 043000096 | | PNC BANK, NATIONAL ASSOCIATION |

| Beneficiary Bank Address: | City: | State: |
|---|---|---|
| | WILMINGTON | DE |

Additional Instructions:

## Wire Fees

Wells Fargo wire transfer fees will be charged to the Originator's Debit Account. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments and, if applicable, on the Wells Fargo Combined Disclosure for Outgoing Consumer International Wires. Additional fees from intermediary and beneficiary banks may be charged to international transactions. My signature here indicates agreement to all of the information on this Outgoing Wire Transfer Request and to the terms and conditions of this request. Wells Fargo is authorized to rely on the information on this Request in making the requested funds transfer.

Wells Fargo Wire Fee Amount:
$40.00

## Authorized Party Signature

I'm sure this isn't a scam, and I'd like to send my wire.

Authorized Party Name
FERCAN E KALKAN

Authorized Party Signature

☐ Submit manually
☐ Signature not required

Date:
07/07/2025

Customer Copy

WTR6603 (3-25 SVP)

# Wire Transfer Services

Outgoing Wire Transfer Request



| | | | |
|---|---|---|---|
| Today's Date: | | Wells Fargo Reference Number: | |
| 08/08/2025 | | FW0068510220479189 | |
| Banker Name: | | Officer/Portfolio Number: | |
| MONICA CASTILLO | | L7911 | |
| Banker Phone: | Branch Number: | Banker AU: | Banker MAC: |
| 713/785-5343 | 07911 | 0068510 | T0029-010 |

Outgoing wires can only be sent for Wells Fargo customers. Provide the Customer Copy to the customer ensuring you give them the Wire Transfer Agreement on pages 3 and 4. Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See the Wire Transfer Information for explanations of the Mexican CLABE number, the SWIFT BIC, the International Routing Code ("IRC") , Indian Financial System Code (IFSC) and the International Bank Account Number ("IBAN").

## Originator's Information

| | | | | |
|---|---|---|---|---|
| Authorized Party Name: | | | Street Address: | |
| FERCAN E KALKAN | | | 143 MANOR LAKE ESTATES DR | |
| Primary ID Type: | Primary ID Description: | | Address Line 2: | |
| PINV WS | PIN Validation | | | |
| Primary ID St/Ctry/Prov: | Primary ID Issue Date: | Primary ID Expiration Date: | Address Line 3: | |
| | NONE | NONE | | |
| Secondary ID Type: | Secondary ID Description: | | City: | State: |
| KNWN | Known Customer | | SPRING | TX |
| Secondary ID State/Country: | Secondary ID Issue Date: | Secondary ID Expiration Date: | ZIP/Postal Code: | Country: |
| | NONE | NONE | 773793722 | |
| Home Phone: | | | Business Phone: | |
| | | | 281/770-3113 | |
| Originator Name: | | | | |
| PINEY POINT 2023 LLC | | | | |

## Wire Amount and Source of Funds

| | | | |
|---|---|---|---|
| Create AU: | Amount (US Dollars): | Debit Wells Fargo Account: | Bank/COID: |
| 0068510 | $334,694.24 | 2791635127 | 00808 |

## Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds)

| | |
|---|---|
| Beneficiary/Recipient Name: | Name/Address Line 1: |
| JLL COLLECTION CLEARING ACCTNOT PRO | |
| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): | Name/Address Line 2: |
| 1029098683 | |
| Purpose of Funds: | Name/Address Line 3: |
| MORTGAGE PAYMENT 689190 | PITTSBURGH, PA, US |
| | Beneficiary Phone Number: |
| Additional Instructions: | |
| LOAN NUMBER 689190 | |



## Customer Copy

**Beneficiary Bank** (This is the financial institution where the beneficiary maintains their account.)

| ABA/RTN | SWIFT/BIC: | Beneficiary Bank Name: | |
|---|---|---|---|
| 043000096 | | PNC BANK, NATIONAL ASSOCIATION | |

| Beneficiary Bank Address: | City: | State: |
|---|---|---|
| | WILMINGTON | DE |

Additional Instructions:

## Wire Fees

Wells Fargo wire transfer fees will be charged to the Originator's Debit Account. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments and, if applicable, on the Wells Fargo Combined Disclosure for Outgoing Consumer International Wires. Additional fees from intermediary and beneficiary banks may be charged to international transactions. My signature here indicates agreement to all of the information on this Outgoing Wire Transfer Request and to the terms and conditions of this request. Wells Fargo is authorized to rely on the information on this Request in making the requested funds transfer.

Wells Fargo Wire Fee Amount:

$40.00

## Authorized Party Signature

I'm sure this isn't a scam, and I'd like to send my wire.

Authorized Party Name

FERCAN E KALKAN

Authorized Party Signature

| | ☐ Submit manually | Date: |
|---|---|---|
| | ☐ Signature not required | 08/08/2025 |



WTR6603 (3-25 SVP)

# Wire Transfer Services

## Outgoing Wire Transfer Request



| | |
|---|---|
| Today's Date: | Wells Fargo Reference Number: |
| 09/15/2025 | FW0068510258953141 |
| Banker Name: | Officer/Portfolio Number: |
| MONICA CASTILLO | L7911 |

| Banker Phone: | Branch Number: | Banker AU: | Banker MAC: |
|---|---|---|---|
| 713/785-5343 | 07911 | 0068510 | T0029-010 |

Outgoing wires can only be sent for Wells Fargo customers. Provide the Customer Copy to the customer ensuring you give them the Wire Transfer Agreement on pages 3 and 4. Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See the Wire Transfer Information for explanations of the Mexican CLABE number, the SWIFT BIC, the International Routing Code ("IRC"), Indian Financial System Code (IFSC) and the International Bank Account Number ("IBAN").

### Originator's Information

| Authorized Party Name: | | Street Address: | |
|---|---|---|---|
| FERCAN E KALKAN | | 143 MANOR LAKE ESTATES DR | |
| Primary ID Type: | Primary ID Description: | Address Line 2: | |
| ALID PR | SRC1914350195 | | |
| Primary ID St/Ctry/Prov: | Primary ID Issue Date: | Primary ID Expiration Date: | Address Line 3: |
| | 09/15/2023 | 09/15/2033 | |
| Secondary ID Type: | Secondary ID Description: | City: | State: |
| KNWN | Known Customer | SPRING | TX |
| Secondary ID State/Country: | Secondary ID Issue Date: | Secondary ID Expiration Date: | ZIP/Postal Code: | Country: |
| | NONE | NONE | 773793722 | |
| Home Phone: | | Business Phone: | |
| | | 281/770-3113 | |

Originator Name:

PINEY POINT 2023 LLC

### Wire Amount and Source of Funds

| Create AU: | Amount (US Dollars): | Debit Wells Fargo Account: | Bank/COID: |
|---|---|---|---|
| 0068510 | $334,694.24 | 2791635127 | 00808 |

### Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds)

| Beneficiary/Recipient Name: | Name/Address Line 1: |
|---|---|
| JLL COLLECTION CLEARING ACCNOT PRO | |
| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): | Name/Address Line 2: |
| 1029098683 | |
| Purpose of Funds: | Name/Address Line 3: |
| MORTGAGE PAYMENT 689190 | PITTSBURGH, PA, US |
| | Beneficiary Phone Number: |
| Additional Instructions: | |
| LOAN NUMBER 689190 | |



WTR6603 (3-25 SVP)

**Beneficiary Bank** (This is the financial institution where the beneficiary maintains their account.)

| ABA/RTN | SWIFT/BIC: | Beneficiary Bank Name: | |
|---|---|---|---|
| 043000096 | | PNC BANK, NATIONAL ASSOCIATION | |
| Beneficiary Bank Address: | | City: | State: |
| | | WILMINGTON | DE |
| Additional Instructions: | | | |

## Wire Fees

Wells Fargo wire transfer fees will be charged to the Originator's Debit Account. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments and, if applicable, on the Wells Fargo Combined Disclosure for Outgoing Consumer International Wires. Additional fees from intermediary and beneficiary banks may be charged to international transactions. My signature here indicates agreement to all of the information on this Outgoing Wire Transfer Request and to the terms and conditions of this request. Wells Fargo is authorized to rely on the information on this Request in making the requested funds transfer.

Wells Fargo Wire Fee Amount:

$40.00

## Authorized Party Signature

I'm sure this isn't a scam, and I'd like to send my wire.

Authorized Party Name

FERCAN E KALKAN

Authorized Party Signature



☐ Submit manually

☐ Signature not required

Date:

09/15/2025

Customer Copy

WTR6603 (3-25 SVP)

# Wire Transfer Services

Outgoing Wire Transfer Request



**WELLS FARGO**

| Today's Date: | | | Wells Fargo Reference Number: |
|---|---|---|---|
| 10/15/2025 | | | FW0068510288268872 |
| Banker Name: | | | Officer/Portfolio Number: |
| SAM QUANG CHUNG | | | A3140 |
| Banker Phone: | Branch Number: | Banker AU: | Banker MAC: |
| 713/785-5343 | 07911 | 0068510 | T0029-010 |

Outgoing wires can only be sent for Wells Fargo customers. Provide the Customer Copy to the customer ensuring you give them the Wire Transfer Agreement on pages 3 and 4. Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See the Wire Transfer Information for explanations of the Mexican CLABE number, the SWIFT BIC, the International Routing Code ("IRC"), Indian Financial System Code (IFSC) and the International Bank Account Number ("IBAN").

## Originator's Information

| Authorized Party Name: | | | Street Address: | |
|---|---|---|---|---|
| FERCAN E KALKAN | | | 143 MANOR LAKE ESTATES DR | |
| Primary ID Type: | Primary ID Description: | | Address Line 2: | |
| ALID PR | SRC1914350195 | | | |
| Primary ID St/Ctry/Prov: | Primary ID Issue Date: | Primary ID Expiration Date: | Address Line 3: | |
| | 09/15/2023 | 09/15/2033 | | |
| Secondary ID Type: | Secondary ID Description: | | City: | State: |
| PINV NS | PIN Validation | | SPRING | TX |
| Secondary ID State/Country: | Secondary ID Issue Date: | Secondary ID Expiration Date: | ZIP/Postal Code: | Country: |
| | NONE | NONE | 773793722 | |
| Home Phone: | | | Business Phone: | |
| | | | 281/770-3113 | |
| Originator Name: | | | | |
| PINEY POINT 2023 LLC | | | | |

## Wire Amount and Source of Funds

| Create AU: | Amount (US Dollars): | Debit Wells Fargo Account: | Bank/COID: |
|---|---|---|---|
| 0068510 | $334,694.24 | 2791635127 | 00808 |

## Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds)

| Beneficiary/Recipient Name: | Name/Address Line 1: |
|---|---|
| JLL COLLECTION CLEARING ACCTNOT PRO | |
| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): | Name/Address Line 2: |
| 102909683 | |
| Purpose of Funds: | Name/Address Line 3: |
| MORGAGE PAYMENT 689190 | PITTSBURGH, PA, US |
| | Beneficiary Phone Number: |
| Additional Instructions: | |
| LOAN NUMBER 689190 | |

Customer Copy

WTR6603 (3-25 SVP)

## Beneficiary Bank (This is the financial institution where the beneficiary maintains their account.)

| ABA/RTN | SWIFT/BIC: | Beneficiary Bank Name: | |
|---|---|---|---|
| 043000096 | | PNC BANK, NATIONAL ASSOCIATION | |

| Beneficiary Bank Address: | | City: | State: |
|---|---|---|---|
| | | WILMINGTON | DE |

Additional Instructions:

## Wire Fees

Wells Fargo wire transfer fees will be charged to the Originator's Debit Account. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments and, if applicable, on the Wells Fargo Combined Disclosure for Outgoing Consumer International Wires. Additional fees from intermediary and beneficiary banks may be charged to international transactions. My signature here indicates agreement to all of the information on this Outgoing Wire Transfer Request and to the terms and conditions of this request. Wells Fargo is authorized to rely on the information on this Request in making the requested funds transfer.

Wells Fargo Wire Fee Amount:

$40.00

## Authorized Party Signature

I'm sure this isn't a scam, and I'd like to send my wire.

Authorized Party Name

FERCAN E KALKAN

Authorized Party Signature

☐ Submit manually
☐ Signature not required

Date:

10/15/2025

WTR6603 (3-25 SVP)

## *Independent Financial*

*Website:*   www.ifinancial.com

## **Outgoing Wire Transfer Request**

### **Wire Transfer Message Reference**        20241240103700

### **WIRE TO:**

| | |
|---|---|
| Bank ABA No.(ID/Type): | 043000096 |
| Bank Name: | PNC BANK, NATIONAL ASSOCIATION |
| Amount: | $ 574,513.58 |
| Special Instructions | |

### **CREDIT TO:**

| | |
|---|---|
| Name: | JLL REAL ESTATE CAPITAL, LLC |
| Address: | NOT PROVIDED |

| | |
|---|---|
| Account Number: | 1029098683 |
| Special Instructions | FERCAN KALKAN |
| | LOAN # 68190 |

Beneficiary Bank ABA
Beneficiary Bank Name:

### **ORIGINATED BY:**

| | |
|---|---|
| Name: | TEXAS EXCEL PROPERTY MANAGEMENT SERVICES |
| Address: | 143 MANOR EAST LAKE DRIVE |
| | SPRING TX 77379 |

Account Number:        1200907937

Special Instructions

I hereby authorize Independent Financial to charge my account for a wire transfer as stated above.
The recipient may receive less than the amount shown due to fees charged by the intermediate
and/or recipient banks.

| Customer Signature: | Per customer request | Date: | 05/03/2024 | Time: | 11:12 am |
|---|---|---|---|---|---|
| Customer | Texas Excel - Fercan Kalkan | | Customer Telephone | | 281-770-3113 |

I certify that funds are available in the Customer's account and submit this transfer request.

| Bank Personnel | Hanna Rodriguez | Date: | 05/03/2024 | | Phone: | x76674 |
|---|---|---|---|---|---|---|
| | Fax: | | Branch #: | 460 | | |
| Authorized by: | | Date: | 05/03/2024 | | Time: | 11:16 m |

# *Independent Financial*

## Outgoing Wire Transfer Request

**Wire Transfer Message Reference**     20243300087600

### WIRE TO:

| | |
|---|---|
| Bank ABA No.(ID/Type): | 043000096 |
| Bank Name: | PNC BANK, NATIONAL ASSOCIATION |
| Amount: | $ 50,000.00 |
| Special Instructions | |

### CREDIT TO:

| | |
|---|---|
| Name: | JLL COLLECTION CLEARING ACCTNOT PRO |
| Address: | NOT PROVIDED |
| Account Number: | 1029098683 |
| Special Instructions | FERCAN KALKAN |

Beneficiary Bank ABA
Beneficiary Bank Name:

### ORIGINATED BY:

| | |
|---|---|
| Name: | TEXAS EXCEL PROPERTY MANAGEMENT SERVICES |
| Address: | 143 MANOR EAST LAKE DRIVE |
| | SPRING TX 77379 |
| Account Number: | 1200908208 |

Special Instructions

I hereby authorize Independent Financial to charge my account for a wire transfer as stated above. The recipient may receive less than the amount shown due to fees charged by the intermediate and/or recipient banks.

Customer Signature: _____ Date: _____ Time: _____

Customer _____ Customer Telephone _____

I certify that funds are available in the Customer's account and submit this transfer request.

Bank Personnel _____ Date: _____ Phone: _____

Fax: _____ Branch #: _____

Authorized by: _____ Date: _____ Time: _____

# *Independent Financial*

## Outgoing Wire Transfer Request

**Wire Transfer Message Reference**     20242890158900

### WIRE TO:

| | |
|---|---|
| Bank ABA No.(ID/Type): | 043000096 |
| Bank Name: | PNC BANK, NATIONAL ASSOCIATION |
| Amount: | $ 50,000.00 |
| Special Instructions | |

### CREDIT TO:

| | |
|---|---|
| Name: | JLL COLLECTION CLEARING ACCTNOT PRO |
| Address: | NOT PROVIDED |
| Account Number: | 1029098683 |
| Special Instructions | FERCAN KALKAN |

Beneficiary Bank ABA
Beneficiary Bank Name:

### ORIGINATED BY:

| | |
|---|---|
| Name: | TEXAS EXCEL PROPERTY MANAGEMENT SERVICES |
| Address: | 143 MANOR EAST LAKE DRIVE |
| | SPRING TX 77379 |
| Account Number: | 1201253331 |

Special Instructions

I hereby authorize Independent Financial to charge my account for a wire transfer as stated above. The recipient may receive less than the amount shown due to fees charged by the intermediate and/or recipient banks.

Customer Signature: _____ Date: _____ Time: _____

Customer _____ Customer Telephone _____

I certify that funds are available in the Customer's account and submit this transfer request.

Bank Personnel _____ Date: _____ Phone: _____

Fax: _____ Branch #: _____

Authorized by: _____ Date: _____ Time: _____

# *Independent Financial*

Independent Financial
7777 Henneman Way
McKinney, TX 75070                                    *Website:*        www.ifinancial.com

## Outgoing Wire Transfer Request

**Wire Transfer Message Reference**          20242700047500

## WIRE TO:

| | |
|---|---|
| Bank ABA No.(ID/Type): | 043000096 |
| Bank Name: | PNC BANK, NATIONAL ASSOCIATION |
| Amount: | $ 1,000,000.00 |
| Special Instructions | |

## CREDIT TO:

| | |
|---|---|
| Name: | JLL COLLECTION CLEARING ACCT |
| Address: | 2177 YOUNGMAN AVENUE |
| | ST. PAUL, MN 55116 |
| Account Number: | 1029098683 |
| Special Instructions | FERCAN KALKAN |
| | LOAN # 68190 |

Beneficiary Bank ABA
Beneficiary Bank Name:

## ORIGINATED BY:

| | |
|---|---|
| Name: | TEXAS EXCEL PROPERTY MANAGEMENT SERVICES |
| Address: | 143 MANOR EAST LAKE DRIVE |
| | SPRING TX 77379 |
| Account Number: | 1201253331 |

Special Instructions

I hereby authorize Independent Financial to charge my account for a wire transfer as stated above.
The recipient may receive less than the amount shown due to fees charged by the intermediate
and/or recipient banks.

Customer Signature: _____ Date: _____ Time: _____

Customer _____ Customer Telephone _____

I certify that funds are available in the Customer's account and submit this transfer request.

Bank Personnel _____ Date: _____ Phone: _____
                    Fax: _____ Branch #: _____

Authorized by: _____ Date: _____ Time: _____

# *Independent Financial*

## Outgoing Wire Transfer Request

**Wire Transfer Message Reference**          20242530157900

### WIRE TO:

| | |
|---|---|
| Bank ABA No.(ID/Type): | 043000096 |
| Bank Name: | PNC BANK, NATIONAL ASSOCIATION |
| Amount: | $ 500,000.00 |
| Special Instructions | |

### CREDIT TO:

| | |
|---|---|
| Name: | JLL COLLECTION CLEARING ACCTNOT PRO |
| Address: | NOT PROVIDED |
| Account Number: | 1029098683 |
| Special Instructions | FERCAN KALKAN |

Beneficiary Bank ABA
Beneficiary Bank Name:

### ORIGINATED BY:

| | |
|---|---|
| Name: | TEXAS EXCEL PROPERTY MANAGEMENT SERVICES |
| Address: | 143 MANOR EAST LAKE DRIVE |
| | SPRING TX 77379 |
| Account Number: | 1201253331 |

Special Instructions

I hereby authorize Independent Financial to charge my account for a wire transfer as stated above.
The recipient may receive less than the amount shown due to fees charged by the intermediate
and/or recipient banks.

Customer Signature: _____   Date: _____   Time: _____

Customer _____   Customer Telephone _____

I certify that funds are available in the Customer's account and submit this transfer request.

Bank Personnel _____   Date: _____   Phone: _____
              Fax: _____   Branch #: _____

Authorized by: _____   Date: _____   Time: _____

# EXHIBIT F



*12/15/2025*

From: **Z.E. Wotila – President, Restoration Claims, LLC**
Address: **14670 County Road 1131, Flint, TX 75762**
Phone: **(817) 532-7238**
Email: **ze@restorationpa.com**

To: **Joyce Lindauer - Attorney at Law**
**A. Davut Atik – Attorney at Law**
Address: **117 S. Dallas Avenue, Ennis, TX 75119**
Phone: **(214) 957-8039**
Email: **joyce@joycelindaur.com**

Reg: **Critical Mass Holdings and Dr. Fercan Kalkan**
Properties: **Piney Point Apartments**
**2601 Lazy Hollow Drive, Houston, TX 77063**
**Claim No:** **E&M: File #1000551788**
Date of Loss: **7/8/2024**          Loss Type: **Beryl – Named Hurricane**

Dear Ms. Lindauer,

I am writing another response to your difficulties with the lender of **Piney Point Apartments** and an update on the claim status:

**Background:**

- The property suffered extensive **force majeure storm damage** from a severe weather event on July 7-8th, 2024, with wind speeds clocking in at 106 MPH with sustained winds over 73MPH. It was enough to knock out the power for 37 consecutive days (see photo report).
- On August 8th, Dr. Kalkan engaged me (*Z.E. Wotila of Restoration Claims*) as public adjuster for the current property and others.
- Preliminary inspections were performed by Mr. Wotila on August 26th at **Piney Point Apartments**. It was noted that already emergency repairs had been completed so all the damage was not evident upon inspection but clearly all the roofs require replacement.
- A claim was filed in September with the multi-lines carrier for the damage sustained to the property.
- The Engle Martin adjuster assigned to the claim by carrier met with Critical Mass owners and Mr. Wotila on October 1 and October 13 to discuss and do initial gathering of information for the outstanding claims, including **Piney Point Apartments**
- Onsite inspections were completed by consultants, adjusters and engineers (JS Held) on October 22nd, 2025.

**Status:**

- Estimates are being prepared and should be completed within the next 30-60 days. Initial payments should be released shortly thereafter. **We have submitted over $13M in direct expenses incurred by Dr. Kalkan, including business interruption (BI) which caused a huge decrease in loss revenue, which is covered under his insurance policy. This does not include the repairs that will be needed (and should be reimbursed by insurance claim) for permanent repairs such as complete re-roofing.**

- Restoration Claims' estimates, which will likely be significantly more than carrier adjuster's initial offer should be completed within 30 days of that. After initial payout by carrier, the real negotiations will begin by my firm and carrier.
- **Initial repair estimates by Restoration Claims are expected to be more than $25 million, fully reimbursable.**

**Summary:**

**The insurance carrier has fully inspected the damage to the property in question. The claim number is listed above, and the assigned lead adjuster is still Andrew Brown of Engle Martin and Associates. We are awaiting reports from the inspectors, engineers and consultants hired by the insurance carriers. We have been assured that we will receive the completed reports, likely within the next 30-60 days. Part of the delay is due to Piney Point Apartments being a part of a group of 19 properties in a 9 figure ($100M) claim filed for the catastrophic destruction done earlier this year over several storm dates. I am still confident that the payout on Piney Point Apartments itself should be more than $25M. It is imperative that this claim for Piney Point Apartments be allowed to continue so that the property has the potential to re-claim its beautification. The storm this year, which was so severe in magnitude, has been catastrophic to the property.**

**I realize that time is essential for both you and the lenders and I am making every effort to settle with your insurance carrier, to the best of my ability. It is essential that you keep an insured interest in this property for all parties to be properly indemnified and full recovery to take place.**

**I am available for any questions, comments or concerns.**

**My very best, Z.E.**

**Signature: _____     Date: ___12/15/2025_____**

**Name Printed: ___Z.E. Wotila_____**

**Z.E. Wotila, CPIA - President**
**Restoration Claims, LLC**
**Public Adjuster – Licensed; TX #2165758**
**Insurance Claims Appraiser/Umpire**

**14670 County Road 1131, Flint, TX 75762**
**(817) 532-7238 - Mobile**
**ze@restorationpa.com**

# EXHIBIT G

# Village At Piney Point Walkthrough 

| | |
|---|---|
| **from:** | **Jein** <jein@havenrockinv.com> |
| **to:** | ███████████████████████ ▮>,<br>kalkan1 KALKAN <kalkan1@gmail.com> |
| **cc:** | ████████████████████████<br>████████████████████████ ▮>,<br>Esther Craven <ESTHER@tarantino.com> |
| **date:** | Sep 2, 2025, 8:21 AM |
| **subject:** | Onsite Due Diligence - Village At Piney Point Walkthrough |
| **ed-by:** | havenrockinv.com |

Our team was there at 10am to meet with you and your leasing and maintenance teams. You were not available due to court. I understand you are busy. Our diligence has started and we need to complete it according to our agreement. Again, we kindly request your full cooperation and access:

1. Unit Walk-Throughs: All vacant units Friday - Tuesday, On Friday we would like to develop a plan to walk through every unit that we need to walk in each building.
2. Mechanical, Electrical, and Plumbing Access: We will require access to all mechanical systems, including chillers, all electrical panels, and plumbing (boilers). We will need to see records of all repairs during your ownership, current list of contracts and contractors.
3. Financial Records: We will need direct access to all financial records, accounting receipts, invoices (including any outstanding and unpaid invoices), bank statements, and profit and loss statements.
4. Lease Verification: Access to property management software and all leases (necessary to verify the current economic occupancy).
5. Documentation and Contracts: We will also need to review all contracts, such as those related to chillers, landscaping, roofing, laundry, tax protests, and Section 8.

Thank you for your assistance. Some of this is covered in the dropbox you sent earlier today. Please confirm we have everything.

**Jein Gadson**
**Havenrock Investments**
Jein@Havenrockinv.com
713-584-3135
www.Havenrockinv.com



# EXHIBIT H



PRESS RELEASE

# Real Estate Investor Pleads Guilty to $165M Mortgage Fraud Conspiracy

Thursday, December 14, 2023

**For Immediate Release**

Office of Public Affairs

A New York man pleaded guilty yesterday to engaging in an extensive multi-year conspiracy to fraudulently obtain over $165 million in loans and fraudulently acquire multifamily and commercial properties.

According to court documents, between 2018 and 2020, Boruch "Barry" Drillman, 36, of New York, conspired with at least four others to deceive lenders into issuing multifamily and commercial mortgage loans. Drillman and his co-conspirators provided the lenders with fictitious documents, including purchase and sale contracts with inflated purchase prices. Drillman managed BRC Williamsburg Holdings LLC, which purchased multifamily property Williamsburg of Cincinnati in Cincinnati, Ohio, and Troy Technology Holdings LLC, which purchased commercial property Troy Technology Park in Troy, Michigan.

In March 2019, Williamsburg of Cincinnati was acquired for $70 million. However, Drillman and his co-conspirators from Rhodium Capital Advisors utilized a stolen identity to present a lender and Fannie Mae with a purchase and sale contract for $95.85 million and other fraudulent documents. On March 8, 2019, Madison Title Agency performed two closings, one for the true $70 million sales price and another for the fraudulent $95.85 million sales price presented to the lender.

In September 2020, Troy Technology Park was acquired for $42.7 million. However, Drillman and his co-conspirators presented the lender with a fraudulent purchase and sale contract for $70 million. Additionally, to support the inflated purchase price, Drillman and his co-conspirators submitted to the lender and appraiser a fraudulent letter of intent to purchase the property from another party for $68.8 million and other fraudulent documents. To conceal the fraudulent nature of the transaction, Drillman and his co-conspirators arranged for a short-term $30 million loan, which was used to make it appear that they had the funds needed to close on the loan. On Sept. 25, 2020, Riverside Abstract performed two closings, one for the true $42.7 million sales price and another for the fraudulent $70 million sales price presented to the lender.

Drillman pleaded guilty to one count of conspiracy to commit wire fraud affecting a financial institution. He is scheduled to be sentenced on April 16, 2024, and faces a maximum penalty of five years in prison. A federal district court judge will determine any sentence after considering the U.S. Sentencing Guidelines and other statutory factors.

Acting Assistant Attorney General Nicole M. Argentieri of the Justice Department's Criminal Division, U.S. Attorney Philip R. Sellinger for the District of New Jersey, Inspector General Brian M. Tomney of the Federal Housing Finance Agency Office of Inspector General (FHFA-OIG), and Postal Inspector in Charge Eric Shen of the U.S. Postal Inspection Service's (USPIS) Criminal Investigations Group made the announcement.

The FHFA-OIG and USPIS are investigating the case.

Trial Attorneys Siji Moore of the Criminal Division's Fraud Section and Assistant U.S. Attorney Martha Nye for the District of New Jersey are prosecuting the case.

*Updated February 6, 2025*

## Topics

FINANCIAL FRAUD | MORTGAGE FRAUD

## Components

Criminal Division | Criminal - Criminal Fraud Section | USAO - New Jersey

Press Release Number: 23-1422

# Related Content

**PRESS RELEASE**

## CEO of Health Care Software Company Sentenced for $1B Fraud Conspiracy

An Arizona man was sentenced Friday to 15 years in prison and ordered to pay more than $452 million in restitution for conspiring to defraud Medicare and other federal health…

December 22, 2025

**PRESS RELEASE**

## Ukrainian-Israeli Man Pleads Guilty to Multimillion-Dollar Fake Brokerage Scheme

A Ukrainian-Israeli national pleaded guilty today to wire fraud in connection with his participation in a large-scale, fake stock-brokerage organization. Yaroslav Shilkloper, 49, a dual citizen of Ukraine and Israel…

December 18, 2025

**PRESS RELEASE**

## Co-Founder of Paycheck Protection Program Lender Service Provider Sentenced for $65M COVID-19 Relief Fraud Scheme

A co-founder of a lender service provider was sentenced to 10 years in prison for participating in a scheme to fraudulently obtain over $65 million in Paycheck Protection Program (PPP) loans…

December 18, 2025



✉ **Office of Public Affairs**

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington DC 20530

📞 Office of Public Affairs Direct Line

202-514-2007

Department of Justice Main Switchboard

202-514-2000

# EXHIBIT I



**PRESS RELEASE**

# Three Real Estate Investors Plead Guilty to $119M Mortgage Fraud Conspiracy

Thursday, August 1, 2024

**For Immediate Release**

Office of Public Affairs

Three real estate investors have pleaded guilty to engaging in an extensive, multi-year conspiracy to fraudulently obtain a $74 million loan and a $45 million loan and fraudulently acquire multifamily properties.

Fredrick Schulman, 72, of New York, and Chaim "Eli" Puretz, 29, of New Jersey, pleaded guilty today to one count of conspiracy to commit wire fraud affecting a financial institution. Moshe "Mark" Silber, 34, of New York, pleaded guilty on July 9 to one count of conspiracy to commit wire fraud affecting a financial institution.

According to court documents, between 2018 and 2020, Silber, Schulman, and Puretz conspired with others to deceive lenders into issuing a mortgage loan for a multifamily property and Fannie Mae into funding or purchasing the mortgage loan. Silber and Schulman were managing members of Rhodium Capital Advisors, an entity that was involved in the acquisition and management of Williamsburg of Cincinnati, an apartment complex in Cincinnati, Ohio. Puretz was one of the owners of commercial property Troy Technology Park in Troy, Michigan. Silber, Schulman, Puretz, and their co-conspirators provided the lenders and Fannie Mae with falsified documents, including a purchase contract with an inflated purchase price and other fraudulent documents.

In March 2019, Williamsburg of Cincinnati was acquired for $70 million. However, Silber, Schulman, and other co-conspirators utilized a stolen identity to present a lender and Fannie Mae with a purchase and sale contract for $95.85 million and other fraudulent documents. On March 8, 2019, two closings were performed, one for the true $70 million sales price and another for the fraudulent $95.85 million sales price presented to the lenders. Based on the co-conspirators' false statements, the lender and Fannie Mae funded a loan in the amount of $74.25 million for the purchase of Williamsburg of Cincinnati.

In September 2020, Troy Technology Park was acquired by Puretz and co-conspirators for $42.7 million. However, to support an inflated purchase price of $70 million, Puretz and his co-conspirators submitted to the lender and appraiser a fraudulent letter of intent to purchase the property from another party for $68.8 million and other fraudulent documents. Based on the fraudulent documents, the lender funded a loan for $45 million. To conceal the fraudulent nature of the transaction, Puretz and his co-conspirators arranged for a short-term $30 million loan, which was used to make it appear that they had the funds needed to close on the sale. On Sept. 25, 2020, a title company based in Lakewood, New Jersey, performed two closings, one for the true $42.7 million sales price and another for the fraudulent $70 million sales price presented to the lender.

Silber, Schulman, and Puretz are scheduled to be sentenced on Dec. 3 and each face a maximum penalty of five years in prison. A federal district court judge will determine any sentence after considering the U.S. Sentencing Guidelines and other statutory factors.

Principal Deputy Assistant Attorney General Nicole M. Argentieri, head of the Justice Department's Criminal Division; U.S. Attorney Philip R. Sellinger for the District of New Jersey; Inspector General Brian M. Tomney of the Federal Housing Finance Agency Office of Inspector General (FHFA-OIG); and Postal Inspector in Charge Eric Shen of the U.S. Postal Inspection Service's (USPIS) Criminal Investigations Group made the announcement.

The FHFA-OIG and USPIS are investigating the case.

Trial Attorney Siji Moore of the Criminal Division's Fraud Section and Assistant U.S. Attorney Martha Nye for the District of New Jersey are prosecuting the case.

Anyone with information concerning similar multifamily or commercial mortgage fraud can report it by contacting the FHFA-OIG Hotline at 800-793-7724 or via the web at www.fhfaoig.gov/ReportFraud#hotlineform.

*Updated February 6, 2025*

**Topic**

**FINANCIAL FRAUD**

**Components**

Criminal Division  |  Criminal - Criminal Fraud Section  |  USAO - New Jersey

Press Release Number: 24-961

# EXHIBIT "J"

**8. Notice.**

(a)    All notices under this Security Instrument shall be:

(1)    in writing, and shall be (A) delivered, in person, (B) mailed, postage prepaid, either by registered or certified delivery, return receipt requested, or (C) sent by overnight express courier;

(2)    addressed to the intended recipient at its respective address set forth at the end of this Security Instrument; and

(3)    deemed given on the earlier to occur of:

(A)    the date when the notice is received by the addressee; or

(B)    if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service.

(b)    Any party to this Security Instrument may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 8.

(c)    Any required notice under this Security Instrument which does not specify how notices are to be given shall be given in accordance with this Section 8.

**9. Mortgagee-in-Possession.**

Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred in this Security Instrument shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and Improvements.

**10. Release.**

Upon payment in full of the Indebtedness, Lender shall cause the release of this Security Instrument and Borrower shall pay Lender's costs incurred in connection with such release.

**11. Trustee.**

(a)    Trustee may resign by giving of notice of such resignation in writing to Lender. If Trustee shall die, resign or become disqualified from acting under this Security Instrument or shall fail or refuse to act in accordance with this Security Instrument when requested by Lender or if for any reason and without cause Lender shall prefer to appoint a substitute trustee to act instead of the original Trustee named in this Security Instrument or any prior successor or substitute trustee.